### GEORGE H. LOMMEN v. MODERN LIFE INSURANCE COMPANY.[1]

January 12, 1940.

No. 32,207.

[1]Reported in 289 N. W. 582.

*R. H. deLambert,* for appellant.
*Oscar Hallam* and *Cummins & Cummins,* for respondent.

STONE, JUSTICE.

Action for an accounting wherein plaintiff, loser below, appeals from the order denying his motion for amended findings or a new trial.

Defendant is a domestic life insurance corporation. It has issued two classes of life policies, "charter" and "non-charter." Plaintiff, holder of a charter policy, sues as a self-designated representative of "all other members of the charter membership class." The distinctive provisions of the charter policies, under which plaintiff wants relief, are these:

"This Policy shall participate from the date of issue in all profits accruing to the policies of this class, which will be composed of savings in mortality, interest in excess of reserve requirements, profit from lapses, savings by economy of management, and divisible surplus from all other sources.

"Beginning at the end of the second year, and each year thereafter, the Company shall annually ascertain the divisible profits which have accrued under this Policy and all like policies as a separate class. Payment of the first dividend shall be conditioned upon the payment of the premium for the succeeding year.

From the profits so ascertained, 60% shall be apportioned for the second policy year and paid as a cash dividend, for the third year 70%, for the fourth year 80%, for the fifth year 90%, and thereafter the full amount thereof shall be so paid."

Plaintiff asserted violation by defendant of the provisions just quoted from the charter policies. The particulars will appear later on as needed to point discussion of the claims made for plaintiff.

In attempted compliance with the special provisions of the charter policies, a special accounting formula was set up by defendant. It required division as between charter and non-charter policies of some items of debit and credit "specifically according to original entries"; of others "according to the fund ratio"; and of still others "according to ratio of total premiums." Additional items were apportioned upon other bases.

The "fund ratio" method of allocation meant that, as matter of accounting, defendant's books showed from time to time a general amount or fund to the credit of the charter policies, and a similar fund to that of non-charter members. The ratio between the two varied from time to time. But, considering the total of the two funds as 100, the ratio of the charter fund might have been 49 and that of the non-charter 51.

There has been another and somewhat similar representative action by one Blomquist as holder of a charter policy. It went to judgment, which was considered determinative below as *res judicata* of some of the questions presented. Among other things, that judgment required some minor changes in defendant's earlier formula for accounting as between charter and non-charter members. As to that, more will appear later. This action is an attempt to overhaul defendant's conduct for 1937 only. Without preliminary summary, we consider the claims for plaintiff in order.

■ Defendant is a stock company, the par value of its stock $10 per share. In 1932 defendant found itself much entangled with Mr. Kay Todd in litigation which was settled by a compromise.

One result was that Mr. Todd then sold defendant 4,200 shares of its own capital stock, for which it credited him $22.50 a share, $12.50 above par. The price went in part into deferred installments which were later paid by defendant. Of that purchase price, $21,603.28 has been charged by defendant against the charters.

The Todd stock, bought in 1932, was, by resolution of the board of directors, approved by the stockholders, retired in 1937. There is a well supported finding that when retired its market value did not exceed par.

The stock went onto defendant's books, at its par value, $42,000, as an asset. From the accounting standpoint, it was an investment. It was just that to the extent that defendant's money went into its purchase. In part offsetting the cost of the stock as an asset on defendant's books, was its par value as a stock liability. By the amount that the price of the stock exceeded its par value, it was not only loss as matter of accounting, but also loss in fact. Substantially half of it has been charged to the charters on the fund ratio basis.

Plaintiff charges no violation of contract in the purchase of the Todd stock. Neither the propriety of that purchase nor defendant's power to make it is questioned. There is not the slightest suggestion of fraud or bad faith in the action of defendant in retiring the stock. Some of the insurance departments, to the regulation of which defendant is subject, required its retirement. They did not like the idea of a life insurance company carrying indefinitely any substantial amount of its own stock as an asset with a corresponding offsetting liability—an attitude with which no informed person will disagree.

That transaction was in sum just this. Aside from its effect in supposedly bringing to an end the troublesome litigation with Mr. Todd, defendant's purchase of his stock resulted in a loss. Its purchase not being challenged, the only remaining question is that of the allocation of the loss between charters and non-charters. It was apportioned on the fund ratio basis. If there had been a profit, plaintiff and the other charters would contend for a dis-

tribution of it (plaintiff's whole argument proceeds on that basis) on the fund ratio formula. It must follow, and the determinative accounting rule established by the decree in the Blomquist case so requires, that the loss be apportioned in the same shares as would have come from dividing a profit, had there been one.

There is much argument for plaintiff sounding in rescission. It is quite beside the mark. He stands on the purchase of the Todd stock, which he does not want rescinded. What he seems to want is a judicial annulment of defendant's retirement of the stock, or at least a judicial accounting surcharging non-charter members. To illustrate, appellant urges that the charter policies should not be charged with payments on the Todd stock after it was retired and they had no further interest in it. They concede, as they must, the loss on the investment, but go on to say that "after the stock was cancelled it was no longer an investment; hence the charters could not be charged with any portion of the payments made after the cancellation. This shows respondent's [defendant's] bad faith and inconsistency." It shows no such thing. True, after the stock had been retired, it ceased to be an investment, but unfortunately the loss remained and had to be apportioned. Such a "loss on investment" was properly allocated between charter and non-charter policies on the fund ratio basis under the applicable formula.

■ For plaintiff the next ground of rebellion has to do with the item of legal expense. All such expenses incurred by defendant during 1937 were apportioned between charters and non-charters on the fund ratio basis. Plaintiff's particular complaint is put upon the charge for legal expense incurred by defendant in the Blomquist litigation. The decree directed that the plaintiff therein be reimbursed for his legal and actuarial fees and expenses, and that the resulting charge should be wholly against the charter policies. So far there is no objection. But defendant apportioned all its legal expenses for 1937 on the fund ratio basis, including a substantial item incurred in defending the Blomquist case.

The decision below denying plaintiff relief on this claim is inescapable under the controlling formula. It requires that "invest-

ment expenses (including legal)" be apportioned by the fund ratio. The formulas are lengthy affairs, covering in detail the whole field of defendant's accounting. In none of the numerous items, other than the one just quoted, is there mention of legal expense. Therefore, the only statement concerning them must control. Neither the old formula nor the one operative since the decree in the Blomquist case made any attempt to allocate any specific legal expenses to charter or non-charter policies. Obviously the intention was to carry them in one general item. That was construed below, we think correctly, to include both investment and legal expense. Inasmuch as the cost of defending against the Blomquist case was general legal expense for 1937, defendant correctly apportioned it by the fund ratio.

■ We come now to another matter concerning which appellant has so much the better of the argument that there must be a new trial as to it and one other point to be mentioned later.

The accounting formula put into force by defendant under the decree in the Blomquist case, by its subdivision I, classified under the heading of "limited charge" four items, as follows:

"1.  Agency Supervision and traveling expense of agency supervisors.
"2.  Branch office expense.
"3.  Agency expense.
"4.  Conservation expense."

The formula required "the above items to be split according to the ratio of total premiums income provided that the total thus charged to charter shall not exceed 4½% of the charter premium of the year." Other divisions of the formula covered "rent" generally, both that received and that paid. Before the Blomquist decree, it had been the practice to carry the rent paid for branch offices under the heading of "branch office expense." Some time before 1937, on the suggestion of the insurance departments, defendant changed its practice and allocated rent for branch offices to accounting classes other than the "agency expense" limited by subdivision I above quoted. That change in accounting practice

operates against the charters in that it removes, as to rent of branch offices, the maximum limit of 4½ per cent fixed by the decree of the Blomquist case.

We hold that the item of rent for branch offices should be accounted for under the formula, not as a general item, of rent paid under subdivision c thereof and thereunder divided "according to the ratio of total premiums," but rather as an item of branch office expense, covered by subdivision I, and so subject to the limitation thereby imposed.

We have considered the opinion testimony of the actuaries and accountants who think that the rents paid for branch offices were properly accounted as rent. As matter of general practice, they are doubtless right. But here the question is not the general one of what is a proper accounting practice, but rather the special one of the rights of the charters under the policies and the decree of the Blomquist case. The latter, we are clear, requires that rent for branch offices be carried as "branch office expense" and so "split according to the ratio of total premiums income," subject to the 4½ per cent limit imposed upon the charge against the charters by the decree of the Blomquist case.

On this point the decision below was in error. As to this issue there must be a new trial. It will be decided in a manner conformable to what has just been written concerning it.

■ We come now to a point raised by the court on oral argument. In respect to it briefs were invited and have been filed. Counsel agree that the question made by the court is without merit, but here it is.

The policy upon which plaintiff sues is a "20 payment life," that is, a limited payment participating life policy. Its peculiar provisions for participation in the earnings of the company have been quoted.

The question is whether those provisions and their effect (if that is their effect) of setting up the charter members as an unduly favored class of participating policyholders amounts to a violation of the statutes of this state.

Counsel agree that our statutes, 1 Mason Minn. St. 1927, §§ 3398-3399, concerning standard forms of life insurance policies, are permissive. But there are two respects in which they are mandatory. After setting up the standard forms, they declare, by § 3402, that no policy of life insurance shall be issued in this state other than the standard form "unless the same shall contain the following provisions." One provision so required is that for participation, found in § 3402(6). It requires a stipulation in every policy that, beginning not later than the end of the third policy year, "the company will annually determine and account for the portion of the divisible surplus accruing on the policy." It goes on with appropriate phrase to protect the interest of the insured in dividends. The participation provision is not required in non-participating policies, nor those on underaverage lives, nor those issued in exchange for lapsed or surrendered policies.

This statute should be read with §§ 3376-3377, prohibiting discrimination. The prohibition is against discrimination not only in acceptance of risks, but also in "rates, premiums, dividends, or benefits of any kind, or by way of rebates, between persons of the same class." That language is taken from § 3376. It is reinforced by § 3377, which explicitly bars discrimination between insured persons "of the same class and equal expectation of life."

The briefs that have been submitted are silent on the question of discrimination. It seems to be assumed that the special terms of the charter policies do not result in discrimination. Maybe so. But the issue is so important that it should be determined in this case. The charter policyholders want an accounting, and they should have one that, so far as possible, will be decisive of all questions arising from the peculiar provisions of their policies.

The record does not give us any figures that can be taken as accurate or up to date. But from the complaint in the Blomquist case, signed as attorneys for the plaintiff therein by the present counsel for plaintiff and Mr. Kay Todd, formerly a president and general counsel of defendant, it is averred that as of December, 1935, defendant had outstanding, in round numbers, $11,000,000 of insurance in addition to its charter class. There is

no indication as to how much of that insurance was nonparticipating. It is further averred that as of the same date defendant had outstanding, again in round numbers, $3,000,000 of the charter class of insurance. The total outstanding policies of defendant in the year 1935 thus are said to be in the proportion of about 11/14 in the non-charter and 3/14 in the charter class.

If, as record and argument suggest, the charter members were entitled to have allocated to them nearly 50 per cent of most of the divisible surplus of the company, it means that 3/14 of the policyholders were getting close to one-half thereof, leaving little over half to the other and less favored 11/14 in the non-charter class. These figures must be far from accurate because they take no account of nonparticipating insurance in the non-charter class. Furthermore, they are but the allegations of the Blomquist complaint, and not supported by evidence. Whether premiums on the charter policies have an additional loading because of the special participating provisions, we are not informed. But the above figures may illustrate to some degree the working of the special provisions of the charter policies in application to divisible surplus.

As to the charter policies, their unique terms permit retention by defendant of only 40 per cent of the second year's "divisible profits," 30 per cent of the third year's, 20 per cent of the fourth year's, and 10 per cent of the fifth year's. Beginning with the sixth year, *all* of that surplus must be paid as a cash dividend. That is, as to these policies, there is no way in which the company can increase reserve after the fifth year. Thereafter the company will be entitled to withhold nothing which as to these policies will go into surplus.

If, either in law or actuarial science, such a method is defensible as to one group of participating policyholders, it must be also as to all an insurer's participating insurance. But, obviously, if all participating policies were so treated, the company, after the five years, could not increase reserve for participating insurance. We need to be shown how any system is defensible which has the effect of depriving an old-line life insurance com-

pany of ability to increase its reserve for participating insurance after the policies are five years old. If perchance such a system, applied to all participating insurance, is legally or actuarially impossible, we need also to be shown how it is permissible as to any class favored as are the charter policies of defendant.

Non-charter policies will presumably continue contributing to surplus during their life, "charters" for only five years. So thereafter the former contribute for the benefit of both, the latter not at all. But when matured, by death or otherwise, one has as much claim as the other to defendant's assets. The question of the actuarial soundness of that plan is not for us. The question whether it results in unlawful discrimination is a legal one. It should be tried and determined in this case. Unless it is, the judgment therein will lack much of finality.

The issue of the propriety of the charter policies under the indicated statutes (and others, if any are applicable) will be litigated on the new trial hereby ordered. That issue will involve not only the proper construction of the charter policies, but also the practical construction heretofore given them.

If the result is decision that there has been no violation of the statutes and none of the discrimination thereby prohibited, the decree of the Blomquist case has doubtless settled the applicable accounting formula. But the question of legality and discrimination, if any, was not raised or even suggested in the Blomquist case. So, to that extent, the decree therein is not *res judicata*. If the result of the new trial is a decision that the charter policies are illegal in part and have resulted in unlawful discrimination in favor of the charter members of defendant, there should be an accounting, which so far as now possible, will remedy the discrimination and award the non-charter members such relief as may be their due. If the charter policies are in part illegal, the policyholders and defendant will not be *in pari delictu,* and the whole "charter" contract will not fall as void. Only the illegal part will be disregarded and the policies considered so reformed as to comply with the law. For the present participation provisions of the charter policies, if they be found illegal, the statutory provision

will be "substituted." Aaberg v. Minnesota Commercial Men's Assn. 143 Minn. 354, 173 N. W. 708.

Probably the suggestion is not needed, but it would not be amiss for the trial court to see that the non-charter policyholders are represented by counsel of their own. If that cannot be done, doubtless one or more lawyers competent in the insurance field can be invited to appear as *amici curiae*. Problems may arise which will require further consideration by qualified actuaries. The issue of discrimination probably cannot be determined without their aid. Anyway, there will be a new trial in respect to the two issues: (1) Legality of the charters and the result, if by any chance they are found illegal; and (2) in the event that their legality is established, the amount of branch office expense (rent seemingly being the principal item in controversy) properly to be charged to the charter policies.

To the extent indicated, the order must be reversed and the case remanded for a new trial of the stated issues.

So ordered.