# ERNEST ABRAHAM v. AUGUST BYMAN AND ANOTHER.[1]

February 26, 1943.

No. 33,370.

[1]Reported in 8 N. W. (2d) 231.

356

Lewis E. Jones, for appellants.
Houston & Huber, for respondent.

JULIUS J. OLSON, JUSTICE.

This is a negligence action arising out of an automobile collision at a highway intersection. Here, as in many cases of this type, each party claims the other to be the sole cause of the disaster. Plaintiff's claim is that, while driving his car southerly on state highway No. 27, the car of defendant August Byman, driven by his son, the defendant Iver Byman, coming from the south, turned abruptly and suddenly into his lane of traffic without giving any signal of such intention. Defendants' claim is that their car had entered and was well toward the north side of the intersection before plaintiff entered it and that their car was being operated carefully and properly. They charge plaintiff with excessive speed, claiming that he had an opportunity to see their car in the intersection long before the collision; that he failed to heed defendants' prior lawful occupancy thereof; and that in consequence of such negligent acts the collision took place.

Plaintiff lumped his claimed damages of $1,075 for personal injuries and damage to his car. At the beginning of the trial, however, counsel agreed that, "in round figures," $275 would be for car damage "and the balance is for personal injuries."

Defendant August Byman, owner of the car struck by plaintiff, counterclaimed for damage to his car, and his son, in like fashion, sought damages for personal injuries. When both parties had rested the court granted plaintiff's motion to instruct the jury "that the defendants be found negligent as a matter of law." Defendants promptly protested and saved their point by appropriate

exceptions. The court submitted as jury issues only the question (1) whether plaintiff was guilty of contributory negligence; and, if not (2) that they award him such amount as would reasonably compensate him for his personal injuries, expenses incurred in connection therewith, loss of time, and damage to his car. The jury awarded him only $177.79, about two-thirds of the estimated damage to his car.

Since the court took from the jury the question of plaintiff's negligence as a basis for defendants' counterclaims, we are required to search the record to ascertain whether there was sufficient evidence to go to the jury on that phase. It is therefore necessary that we view the evidence in the light most favorable to defendants' contentions.

The collision took place during the evening of October 29, 1940. It was dark, both roads were dry, and each driver was well acquainted with the highways and crossing. Both cars had their lights on. The intersection is the one where the state highway between Wheaton and Browns Valley crosses state aid road No. 1. (Hereinafter we shall refer to these as "highway" and "road" respectively.) The highway at this point runs in a general southwesterly-northeasterly direction, the road in an easterly-westerly direction, so that the crossing is at an "acute angle at the northeast and southwest," and at "an oblique angle at the southeast and northwest" points thereof. The highway is tarvia surfaced, 24 feet wide, with a clearly marked center line, and the distance between its graveled shoulders is 38 feet. The sharp angles at the intersection have been well rounded, thereby minimizing the hazards of sharp traffic turns that would otherwise obtain. "The mouth of the road going west where it intersects with highway 27 is 186 feet wide," according to one witness, and the turn to get onto the "road going east [also] has a curve, and the curves are practically in the same proportion as those going west." Defendants' exhibit 4, drawn to scale, shows the "mouth of the road" going west to be 200 feet, that going east, 186 feet. The "whole intersection is tarvia" surfaced.

Prior to the collision both drivers were in their proper traffic lanes on the highway. Defendants' ancient Buick, vintage of 1926, was pulling a four-wheeled trailer heavily loaded with corn which had been picked that afternoon and evening. Defendants were on their way to deliver the corn at the home of a neighbor who lived some distance west of the intersection. A short distance behind the Buick was another car, driven by another son of August, who had assisted in picking and loading the corn. Up to this point there is no substantial dispute in the evidence.

The principal difficulty presented relates to the place where the collision occurred. As to how and where the accident happened, the jury could find that when defendants' car entered the intersection and as it made the turn therein it was traveling at a speed of not to exceed eight miles per hour. Approaching this point there is a gradual rise, with a road ditch, estimated to be about five feet in depth, to the left. Before attempting to make the turn Iver opened the left door of his car. He looked in every direction to ascertain whether there was other traffic but found that there was "none in sight." As he proceeded into the intersection to make the turn and when the "front wheels of his car were off the tarvia" and headed west "the collision happened." He did not observe plaintiff's approaching car until he heard "the wheels squeaking when he [plaintiff] had the brakes on." After the collision measurements were taken of skid marks made by plaintiff's car which extended northerly from the point of collision some 90 feet. The Buick was struck on its right side, pushed some 15 or 20 feet to the southwest, and tipped over there. The trailer hitch was broken, and the trailer remained in the intersection until after the excitement had subsided. Defendants' car when struck "had turned the corner" and was "passing to the west." "He [Iver] had passed the tarvia portion when he got hit," so Iver's brother testified. Neither driver of the north-moving cars saw plaintiff's lights until immediately before the accident, when "there was a flash of light and then a lot of racket." Plaintiff's car when Iver first saw it was about 80 feet away. He judged its speed

at 60 to 70 miles per hour. (This testimony was stricken, however, the court being of opinion that an adequate foundation had not been laid, although Iver testified he had driven automobiles "about ten years" almost "every day" and considered himself capable of judging speed.) There is also testimony of an admission made by plaintiff a few minutes after the accident that: "I was driving plenty fast, but it didn't make any difference to me because I have plenty of insurance." North of the intersection there is a hill which obscures the lights of cars approaching from that direction to a driver headed that way until within about 300 feet from each other.

The reasons for the court's ruling that Iver was "guilty of negligence as a matter of law" are stated in its memorandum and may be thus summarized:

"* * * if he turned as required by [Mason St. 1940 Supp.] Sec. 2720-190(b) * * * he would be making practically a 'U' turn, as provided by Sec. 2720-191. But such a turn cannot be attempted when there is another vehicle approaching within a thousand feet." And, since "the statute provides that signal for other vehicles shall be made by extending the arm for not less than 75 feet before turning" (citing *Id.* §§ 2720-193, 2720-194, 2720-195), and "he [Iver] was hauling a trailer" behind his car "at a dangerous intersection at night," the court deemed his negligence so firmly established as to be undeniable. Finally and "mainly," said the court, "the 'look and see not' theory of the case of Sorenson v. Sanderson, 176 Minn. 299 [223 N. W. 145]," was determinative against Iver.[2]

■ Plaintiff is clearly in error in asserting that we "must view the evidence in its aspects most favorable to the verdict." That would be true if the jury had been permitted to consider and had in fact passed upon Iver's conduct. Instead, insofar as his conduct was concerned, the jury were told that he "was guilty of neg-

---

[2]The corresponding statutory provisions cited herein are found in Minn. St. 1941 as § 169.19, subds. 1(2), 2, 4, 5, 6, 7, and 8, respectively.

ligence as a matter of law." Clearly, if there was a fact issue, the case was for the jury, and the court was in error in determining the matter as one of law. So we come at once to the decisive question: Was Iver's driving at the time and place of the accident so clearly violative of the conduct of the ordinarily prudent man as to remove his conduct from the field of fact to one of law?

■ Such cases as Chandler v. Buchanan, 173 Minn. 31, 216 N. W. 254, and the Sanderson case, 176 Minn. 299, 223 N. W. 145, cited by the trial court, have been often here cited and relied upon, generally by negligent defendants who seek to escape liability by fastening upon the injured plaintiff some sort of claim that his actions or failure to act constituted a contributing cause and thereby destroyed his cause. Both cases have been limited, distinguished, and explained to such an extent in later cases as almost to make them unrecognizable as authorities. We need not cite these later cases, since they are readily available by reference to Shepard's Minnesota Citations, Vol. XLIII, No. 1 (February 1943), at pages 74 and 76.

In the Chandler case, the case of Baltimore & Ohio R. Co. v. Goodman, 275 U. S. 66, 48 S. Ct. 24, 72 L. ed. 167, 56 A. L. R. 645, was cited and the following quotation made from it as authority upon which that opinion largely was placed (173 Minn. 36, 216 N. W. 255): "We are dealing with a standard of conduct, and when the standard is clear it should be laid down once for all by the courts." But the Goodman case did not meet with general approval by the courts. Instead, it often has been criticized and limited, especially by state courts. Finally, in Pokora v. Wabash Ry. Co. 292 U. S. 98, 106, 54 S. Ct. 580, 583, 78 L. ed. 1149, 1155, 91 A. L. R. 1049, the United States Supreme Court definitely held:

"The opinion in *Goodman's case has been a source of confusion* in the federal courts *to the extent that it imposes a standard for application by the judge, and has had only wavering support in the courts of the states. We limit it accordingly."* (Italics supplied.)

The cases to which the court referred are cited under note 4.

The Pokora case is helpful here for the reason that there, as here, the questions of defendants' negligence and plaintiff's contributory negligence were considered in reference to the respective duties of participants to a collision occurring at a street crossing. In its opinion the court, after summarizing the facts, said (292 U. S. 101):

"In such circumstances the question, we think, was for the jury whether reasonable caution forbade his [plaintiff's] going forward in reliance on the sense of hearing, unaided by that of sight. No doubt it was his duty to look along the track from his seat [in a truck driven by him], if looking would avail to warn him of the danger. This does not mean, however, that if vision was cut off by obstacles, there was negligence in going on, any more than there would have been in trusting to his ears if vision had been cut off by the darkness of the night. * * * Pokora made his crossing in the day time, *but like the traveler by night he used the faculties available to one in his position. * * * A jury, but not the court, might say that* with faculties thus limited, *he should have found some other means of assuring himself of safety before venturing to cross."* (Italics supplied.)

And further (292 U. S. 104): "Standards of prudent conduct are declared at times by courts, but they are taken over from the facts of life." Clearly, here, as in that case, there is (292 U. S. 105) "need for caution in framing standards of behavior that amount to rules of law."

As already suggested, we deem it unnecessary to review all our prior cases. Rather, we may repeat what we said in Dahl v. Collette, 206 Minn. 604, 607, 289 N. W. 523:

"It is enough to say that in Guthrie v. Brown, 192 Minn. 434, 437, 256 N. W. 898, 899, we said that in cases like Chandler v. Buchanan * * * that 'the plaintiffs, who were held negligent, heedlessly drove into an intersection without looking to their right. Their testimony that they did look and did not see defend-

ants' cars, *then in plain view and practically at the intersection,* was rejected by this court.'" (Italics supplied.)

Plaintiff in this case, like defendant in that one (206 Minn. 607, 289 N. W. 523), "was not even visible" when Iver "determined that it was safe to make the turn." This may "be accounted for by the fact that" plaintiff "was then in the dip of the road" some 300 or more feet beyond the place where Iver sought to make the turn. "It might have appeared safe" to him "to proceed in the one situation for the reason that" plaintiff "was not then in view and in the other for the reason that" plaintiff "was so far distant at the time that the turn could be safely made." So, "in either situation," Iver's alleged "negligence would be a fact question for the jury." Upon the facts there involved as compared with those here presented, how can it be said that Iver was guilty of negligence as a matter of law (206 Minn. 608, 289 N. W. 523) "in driving across a rural intersection, where there was evidence to show that, when" he "started to cross," he did not see plaintiff's car because of the dip in the road beyond. A similar case upon its facts is that of Kraus v. Saffert, 208 Minn. 220, 293 N. W. 253, where our prior cases are cited and distinguished at pages 224 and 225. Another is that of Norling v. Stempf, 208 Minn. 143, 293 N. W. 250, where we said (headnote 3): "A verdict must stand where a jury could properly find that plaintiff had made an error in judgment which a reasonable man might make."

■ Plaintiff's version as to what occurred at and immediately prior to the accident is thus related by him:

"Well, we saw these cars coming * * * there were two cars and a trailer on one car, and I thought we were just meeting them. And *as we approached the intersection* and were almost across, without any warning or anything, they turned right across, completely blocking the road, and I had no chance to turn to the right or to the left." This turn was made by Iver "about *20 or 25 feet before they got to the intersection.*" (Italics supplied.)

It thus clearly appears that the stories of these two drivers are at complete variance. If plaintiff's story had been submitted to and found to be true by the jury, no one could reasonably question Iver's liability to a charge of negligence. But if the jury believed Iver's story and that of his brother, they could have found that plaintiff's car was not in sight when Iver was turning into the crossing. In that event, he would have had the right of way. And the jury having so found, Iver's failure to extend his left arm to show an intention to turn would be wholly immaterial, since such a signal is only required where other traffic may be guided thereby. Traffic signals to a driver "not in sight" are useless. Nor do we consider tenable the court's opinion that this was a "U" turn on Iver's part. All there is to it is that this was an entry into and across an ordinary country highway crossing. There were no other cars in the vicinity. There were no hazards except those created by one or the other of these drivers, or perhaps by both of them.

Plaintiff suffered three broken ribs, was incapacitated for a considerable length of time, incurred medical and hospital expenses, and his car was badly damaged, yet he was awarded only $177.79, an amount obviously a compromise between liability and actual damages sustained.

The 200-foot length of the intersection and the skid marks made by plaintiff's car extending northerly from the point of collision some 90 feet or more are both facts having an important bearing on plaintiff's conduct. True, the court submitted the question of his contributory negligence to the jury, but the finding in plaintiff's favor on that score could not remove from the minds of the jurors the court's imperative instruction that Iver's conduct was negligent as a matter of law. So, in order to reach an agreement, the jury brought in the verdict it did—obviously a compromise between negligent cause and actual damages. With the claims of the parties so at variance, the court should have submitted the issues to the jury as fact questions, especially where there was evidence in support of the claim of each.

We shall not again attempt to define "negligence" and "contributory negligence." This has been done so often that repetition is not likely to be of benefit to anyone. It is sufficient for our purpose to say that, as we view this record, the questions of defendants' negligence and plaintiff's contributory negligence were both jury issues. Hence it was error for the court to rule that Iver's conduct constituted "negligence as a matter of law."

Order reversed.

