STELLA M. SOLOSKY v. J. A. JOHNSON COMPANY
AND ANOTHER.[1]

March 21, 1947.

No. 34,376.

---

[1]Reported in 27 N. W. (2d) 282.

C. A. *Marr,* for appellant.
*Freeman & King,* for respondents.

FRANK T. GALLAGHER, JUSTICE.

This is an appeal from a judgment of the district court of Hennepin county.

Plaintiff sued defendants, the J. A. Johnson Company and the Northwestern Mutual Life Insurance Company of Milwaukee, to recover for personal injuries sustained by her as the result of defendants' alleged negligence. At the times involved herein, defendant insurance company was the owner of the Rand Tower in Minneapolis, and defendant Johnson company was engaged by it to make some alterations on the building. Plaintiff claims that at about 3:45 p. m. on February 25, 1943, she was injured while standing on the sidewalk close to the Rand Tower corner on the Sixth street side where it intersects Marquette avenue. She contends that because of defendants' negligence a plywood board fell on her head. Prior to the time of the accident, the Johnson company, in connection with changing some doors, had erected an enclosure on the south (Sixth street) and west (Marquette avenue) sides of the building. The extreme height of the enclosure was approximately 11 feet from the ground. Two-by-fours were used for the uprights and plywood panels for the sheeting. It appears that one of these plywood boards about 3 by 4 feet and ¼ inch thick, weighing about 7½ pounds, became detached from the enclosure and struck plaintiff on the head, causing bodily injuries. The parties to the action agreed that the board which hit plaintiff was one used by the Johnson company in making the barricade.

■ The question involved is whether plaintiff's injuries were caused by the negligence of defendants or either of them, since defendants made no allegation in their pleadings of contributory negligence on the part of plaintiff. The jury returned a verdict for defendants. Inasmuch as this is an appeal from a judgment, "the only question for consideration is whether there is any competent evidence reasonably tending to sustain the verdict." Prigge v. Selz, Schwab & Co. 134 Minn. 245, 246, 158 N. W. 975, and cases cited.

In determining this, we are concerned with what the record shows as to evidence regarding the construction of the enclosure, particularly with reference to the board which became detached. Robert Elmblad, the Johnson company's foreman, who assisted in erecting the barricade, testified as to the construction, materials used, and size of the enclosure erected in connection with the repair work being done at the time of the accident. He was not working on the Rand Tower job the day the accident occurred and so did not see it. He did not testify as to the number of nails used in the board in building the enclosure, but confined his testimony mainly to his recollection of the repair work being done and the materials used. Ole Severson, an employe of the Johnson company, who assisted Elmblad when the barricade was put up originally, testified that while he was not working on the Rand Tower job at the time of the accident he did go there that evening about seven o'clock with defendant Johnson. When they got there, they found the board which came off the barricade, and he nailed it back on. We quote from the record as to part of his testimony:

"The Court: Did you put that board up there?
"Witness: Yes, sir, I did.

\* \* \* \* \*

"Q. Did you have somebody else help you put that barricade up?
"A. Sure. Mr. Elmblad was with me. We two done it.
"Q. Well, did you nail some of the boards?
"A. Sure; we both did, I suppose. Hold them up and then nail them on.
"Q. I didn't get that.

"A. We put the board up first, and one hold it until we got some nails started, and we both nail it down.

"Q. One had to hold it and the other pound the nails in?

"A. Yes.

"Q. What size nails were used?

"A. Sixpenny nails.

"Q. Were they driven clear in, or partially?

"A. No, we left them out enough to get ahold with the hammer.

"Q. You drove them in sufficiently, and left enough sticking out to get a hammer underneath the nail?

"A. Yes, sir.

"Q. On which side of the building did this board come off of?

"A. On the Sixth street side.

\* \* \* \* \*

"Q. What we want to know is, how high up from the ground was this piece of board that came off?

"A. It was by the 8-foot piece.

"Q. Does that mean it was 8 feet from the ground?

"A. Just about 8 feet, yes.

"Q. Was the board broken at all?

"A. Yes, it was split where the nail was put in.

"Q. The board was broken where the nail pulled out, is that what you said?

"A. Yes.

"Q. Was the board broken anywhere else?

"A. Not that I can recall."

Plaintiff contends that there was only one sixpenny nail used in originally nailing up the board which fell and that it was only partially driven in. The only direct testimony as to whether one or more nails were used in the board when it was originally nailed to the barricade was that of Mr. Severson quoted above. There is no testimony offered by plaintiff directly contradicting that of Severson as to whether one or more nails were used in the board which came off. Plaintiff calls our attention to the fact that Severson testified that the only place the board was broken was where the nail pulled

out. That in itself is not conclusive that only one nail was used, and we cannot find in the record where Severson or any of defendants' witnesses were specifically asked how many nails were in the board. Severson testified as to the method used in the construction of the barricade, his testimony being to the effect that one of the workmen would hold the board until "we got some nails started," and then "we both nail it down." We are confronted with the well-known rule of this court that the testimony must be considered in the light most favorable to the prevailing party. Bloomquist v. Thomas, 215 Minn. 35, 39, 9 N. W. (2d) 337, 340. If the jury decided that the nailing was done as described by Severson, then the permissible conclusion was that more than one nail was used, inasmuch as both employes participated in nailing the board on the enclosure.

There was also testimony as to the velocity of the wind and the kind of weather on the day of the accident. Plaintiff testified: "It was a very peculiar, freaky, windy day." She stated that with the exception of another occasion when she was in a boat in the middle of Lake Harriet during a cyclone she had never experienced a more "freakish day." Martin Hovde, in charge of the Minneapolis weather bureau office, testified from official records that the wind velocity in Minneapolis was 18 miles per hour between three and four o'clock in the afternoon of the day the accident occurred. It would appear from the official records about the time of the accident that there was nothing particularly unusual about the wind that day, as Mr. Hovde described it as "a moderate wind."

Although an instruction directing a verdict for plaintiff was denied, the court gave the jury all other instructions requested by her, including the *res ipsa loquitur* rule.

The question for the jury to determine was whether any negligence on the part of defendants or either of them was responsible for and caused the accident and injuries to plaintiff. "The issue of negligence is generally a fact question for the jury to determine." Merritt v. Stuve, 215 Minn. 44, 55, 9 N. W. (2d) 329, 334; Abraham v. Byman, 214 Minn. 355, 8 N. W. (2d) 231. It is a jury question

when fair-minded men might reasonably draw different conclusions; it is for the court when the evidence is conclusive, in other words, when it is susceptible of only one reasonable inference and it would be the manifest duty of the court to set aside a contrary verdict. 4 Dunnell, Dig. & Supp. § 7048. In the case before us, the issue of negligence was properly submitted to the jury, which returned a verdict in favor of defendants.

In reviewing the testimony in this case, we have been mindful of the fact, as stated, that there was no claim made by defendants of contributory negligence on the part of plaintiff. The question before the court is whether the evidence as a whole reasonably tends to support the verdict. We believe it does. While it seems unfortunate that an innocent bystander should be injured as plaintiff was in this case, through no apparent fault of her own, we are still confronted with the legal principles involved. It is our duty to sustain the verdict of the jury if it is not manifestly contrary to the evidence. It should not be set aside merely because it is contrary to a slight preponderance of the evidence, or because the appellate court would have found differently, or would have been better satisfied with a contrary verdict, or would have sustained an order of the trial court setting it aside. 1 Dunnell, Dig. & Supp. § 415. It is for these reasons that we feel that the decision of the trial court must be affirmed.

Affirmed.