SANFORD J. DELYEA v. J. FRED GOOSSEN AND ANOTHER.
AAGOT DELYEA v. SAME.
KATHLEEN DELYEA HANF v. SAME.
MARTHA DELYEA KING, APPELLANT.[1]

April 16, 1948.

Nos. 34,541, 34,542, 34,543, 34,547, 34,548, 34,549.

*Snyder, Gale, Hoke, Richards & Janes,* for appellant Martha Delyea King.

*Durham & Swanson,* for appellant J. Fred Goossen.

*Richardson D. Barrett* and *Walter S. Johnson,* for respondents.

FRANK T. GALLAGHER, JUSTICE.

Actions arising out of a collision between two automobiles. At about ten o'clock in the forenoon of August 19, 1944, defendant J. Fred Goossen was operating his 1941 Pontiac sedan over and upon

[1]Reported in 32 N. W. (2d) 179.

state aid highway No. 1 in a southerly direction, and defendant Martha Delyea King·was operating her 1938 Ford coach in a westerly direction over and upon state aid highway No. 11. Both highways are in Wright county, this state. Plaintiffs Sanford J. Delyea and Aagot A. Delyea, husband and wife, are the parents of defendant Martha Delyea King, and plaintiff Kathleen Delyea Hanf (a minor at the time of the trial) is the sister of defendant King. All the plaintiffs were passengers in the King car at the time of the collision. The cases were tried in district court. The jury returned a verdict of $9,000 in favor of plaintiff Sanford J. Delyea, one for $3,500 in favor of plaintiff Aagot Delyea, and one for $12,000 in favor of plaintiff Kathleen Delyea Hanf against both defendants. (The case of Kathleen, a minor, was brought by her father and natural guardian, Sanford J. Delyea.)

Judgments were entered in all cases pursuant to the verdicts, and each defendant appeals from the respective judgments. This court, under date of August 14, 1947, ordered that all the appeals be heard and submitted upon one printed record. The question raised on appeal by defendant Goossen is whether there was any competent evidence of any negligence on his part which proximately caused or contributed to the accident. The question raised by defendant Martha Delyea King is whether the verdicts against her are justified by the evidence. Defendant King contends that the answer to that question turns upon whether plaintiffs, before resting, made out prima facie cases against her, and, if not, *whether the evidence which was adduced by defendant Goossen in his defense, after both the plaintiffs and defendant King had rested,* is evidence in support of plaintiffs' cases against her.

It appears from the record that the collision occurred on the date mentioned. Goossen, accompanied by his wife and son, J. Fred Goossen, Jr., was driving south on state aid highway No. 1. Defendant King, accompanied by her parents, her minor sister Kathleen, and John A. Delyea, her brother (not a party to the actions), was driving west on state aid highway No. 11. Both roadways were gravel-surfaced and practically level. They intersected at right

angles. There was a standing cornfield in the fenced field to the northeast of the intersection. The corn was about five or six feet high and pretty well tasseled out. The traveled portion of highway No. 1 is about 25 feet wide, and that of highway No. 11 about 28 feet. There were no stop or warning signs at the intersection at the time of the accident. A line representing the prolongation or projection southerly across highway No. 11 of the westerly limit of the cornfield would have been 33 feet to the east of the center of the intersection. The distance from the north shoulder of No. 11 north to the cornfield fence was 19½ feet. Between the cornfield and the traveled roadway of No. 11 there was a ditch two or three feet deep. The distance from the east shoulder of highway No. 1 east to the cornfield fence was 14½ feet. Between the cornfield fence and the traveled roadway of highway No. 1 there was no ditch.

Goossen, when called by plaintiffs for cross-examination under the statute, testified that he was on his way from St. Cloud to Mankato; that he was familiar with highway No. 1, upon which he was traveling; that his car was in good driving condition, had good brakes, and was a very good, fast automobile, with a normal load. He recalled that just before the collision he applied his brakes hard and held his foot on the brake, trying to stop. He said that he saw a car approaching from his left, "and I put on my brakes at that time or as soon as my reaction would respond." He said that he kept on his brakes until the impact. With reference to the position of the cars after the impact, Mr. Goossen testified as follows:

"Q. Where did your car wind up after the impact, Mr. Goossen?

"A. To the best of my knowledge, it was approximately in the center of the intersection with my front wheels nearly at right angles to the direction I had been going.

"Q. And do you recall where the other car wound up?

"A. It was to my left diagonally in the ditch facing approximately southwest."

Defendant King, also called by plaintiffs for cross-examination under the statute, testified that she was driving her car west on

highway No. 11 with her parents, her sister, and her brother as her guests, and that they started out from Clearwater Lake in the morning. She said that it was a nice day, that she was on a good gravel road, that her car was in good condition, and that the brakes and tires were all right. She testified that when she got on the graveled road about half a mile east of the intersection she "was going about 35, which is the fastest you were allowed to go [during the war], and before we got to that farmhouse, why then I slowed down to twenty-five." She further testified as follows:

"Q. Then after you had passed the Partridge farmhouse did you step it up again?

"A. No, I didn't because my dad warned me it was going to be a bad corner there so I slowed down to 20."

She said that she saw the cornfield, which was up fairly close, and that it was difficult for her to see what might be on the right-hand side. Further testifying, she said:

"Q. And as you approached the intersection, Mrs. King, were you looking to the right to see if a car might be approaching?

"A. Well, yes, you look on both sides when you come to an intersection. That's what I did.

\* \* \* \* \*

"Q. But you were looking to the right, were you?

"A. Yes.

"Q. Was it before or after you entered the intersection that you first saw the car approaching from your right?

"A. It was before.

"Q. About how long before?

"A. Well, at least over four or five car lengths, I would say."

She testified that at that time she was traveling about 20 miles an hour and that she did not apply her brakes. She said that when she got up to the intersection and realized there was going to be a collision she turned to her left.

"Q. Would you have any idea as to about where you were in the intersection at the time the cars collided? That is, how far out into it or whereabouts, if you could tell us?

"A.  I was on the side of the middle.

"Q.  Which side of the middle?

"A.  To the left."

Plaintiff Sanford J. Delyea, who was riding with Mrs. King, testified that they were not familiar with the road, but that they were headed "west from Clearwater Lake," figuring "on going over to Kimball." He said that it was a nice, fair day and that the road was in good condition. As they approached the intersection, he said that "the speedometer was close to 25." He testified: "They were looking for signs for Kimball, and then when we came to this cornfield I got scared, and I warned Martha [Mrs. King] that that looked like a bad corner. Then I cautioned her that she had better cut down, and she did, and the last that I saw of the speedometer, * * * it registered at 20."

The testimony of Aagot Delyea, Sanford's wife, may be summarized as follows:

"A. * * * we weren't driving too fast because we were watching the scenery, and we came to this lovely farm that, I believe, has been described, designated as the Partridge farm. It was such an unusually well-kept farm that we slowed down just to take a good sight of it because it was so pretty. Just beyond that we came upon this cornfield, and I remember our dad said to Martha, 'This is a bad corner. Take it easy,' and she did slow down.

\*     \*     \*     \*     \*

"Q.  Then what happened as you went into the intersection?

"A.  Well, I happened to look to the right, and a black object was coming. I, of course, knew it was a car. I screamed. Martha screamed. She turned her car slightly to the left, and we were hit.

\*     \*     \*     \*     \*

"Q.  So that your testimony is that she was going something less than 20 or 25 miles an hour as she entered the intersection?

"A.  Yes, sir.

\*     \*     \*     \*     \*

"Q. Mrs. Delyea, do you know with what part of your car the other car came in contact?

"A. With the door on the right-hand side of the car."

Plaintiff Kathleen Delyea Hanf, when questioned about the speed of Mrs. King's car as they came along the road, testified as follows:

"Q. How about speed?

"A. * * * when we came to a certain farm we all noticed how beautiful it was, and so she slowed down to watch the farm from beginning to the end, and to our right was a cornfield. When we came to the intersection, when we came to the corner at the time I was looking for signs to give directions to Kimball, but when we came to the cornfield I didn't pay any attention more to the signs. Then when we came to the intersection I had turned to the right to look down the road. Just as I turned to the right this car came so fast it just hit us. I heard my mother and my sister scream."

The other occupant of Mrs. King's car, her brother, testified in part as follows:

"A. Well, we were going at a moderate rate of speed all the time, and as we came near the intersection my father told Martha to slow down as we were looking for signs at the intersection for to see if we were on the right road to Kimball, and she did slow down, and it was a blind corner there with that corn, it seemed as though it came right practically next to the road, and as we entered the intersection there, I don't remember, I think my attention was drawn to the fact that a car was coming by a scream that my mother let out, and I just remember turning, and about the first half of the car must have been in the intersection, beyond the midpoint of the intersection there. I remember turning, and all I could see was just this Pontiac with the Indian head on the hood, and that was all I can remember seeing of it, and the next thing we were in the ditch up against the corner posts of the farm on the fence line there.

*  *  *  *  *

"* * * I was sitting up straight then in order to see out the back side window.

\* \* \* \* \*

"Q. And if I get you right, it was your right-hand side that was struck by the other car?

"A. Yes."

Otto T. Ball testified on behalf of plaintiffs that he saw Goossen's car as it traveled south on highway No. 1 from a point 80 rods to a point 40 rods from the intersection, and that Goossen's speed was then 50 miles per hour. He claimed that his attention was first attracted by the sound of the exhaust on Goossen's car; that he observed a cloud of dust following the car; and that when he arrived at the scene of the accident he observed skid marks made by the Goossen car extending 30 to 35 feet north from the point of impact. His wife, Martha A. Ball, also testified that she observed skid marks 30 to 35 feet in length made by the Goossen car.

When plaintiffs' attorneys completed examination of the foregoing witnesses, Goossen's attorney made no examination, commenting, "I understand we are not permitted to examine right now." Mrs. King's attorneys asked no questions, and, with the evidence in as partially outlined above, plaintiffs rested their cases. Thereupon Mrs. King rested. She calls attention in her brief to the fact that at that point in the testimony defendant Goossen did not testify as to his speed, the location of Mrs. King's car at any time as he approached or entered the intersection, which car entered the intersection first, where in the intersection the collision occurred, how the cars came together, nor as to any admissions made by either of the drivers at the scene of the accident. Mrs. King also contends in her brief that she did not testify as to the speed of the Goossen car, which car entered the intersection first, where in the intersection the collision occurred, how the cars came together, nor as to any admissions made by either of the drivers at the scene of the accident. An examination of the record shows, however, that she did testify that she saw the other car four or five car lengths before she got into the intersection, and, when asked as to where

in the intersection she was when the cars collided, said she was to the left of the middle, and she marked a place on the plat where she thought the collision occurred and designated places on the plat where she thought her car and the Goossen car were located after they came to a stop.

After plaintiffs and Mrs. King rested, Goossen proceeded with his defense. Testifying in his own behalf, Goossen claimed that he approached the intersection at a speed of 30 to 40 miles an hour and that when he was from 50 to 60 feet north of the intersection he saw Mrs. King's car coming at a speed of from 20 to 25 miles per hour. He claimed that the two cars entered the intersection simultaneously and that at the time of the impact his speed had been reduced "to approximately five to ten miles an hour at the most." He claimed that as a result of the application of the brakes there were skid marks 40 to 50 feet long, and that after the accident Mrs. King said to him, "My, I never saw you." Goossen's wife and son, riding with him, each corroborated his testimony that after the accident Mrs. King said, "I didn't see you at all," or "I never saw you." Mrs. Goossen said that when the cars stopped after the collision the back of their car was at the edge of the intersection in the northwest corner and that the King car was up against a fence in the southwest corner. Goossen's son testified that, while he had been intermittently dozing in the back seat on the trip, he sat up when his father's car was "not too far back from the intersection," and, while chatting with his parents, "happened to glance at the speedometer, and we were going a little bit over 40 miles an hour, about 42, 43 miles an hour." He commented, "Dad, you are exceeding the speed limit here a little," and that his father "bantered back he better cut the speed a little," which he said his father did, but did not say how much. The son thought the accident occurred in the northwest portion of "what would be the driving surface of the intersection." He could not testify as to the speed of the King car, "because I saw it only an instant before the impact."

At the close of all the testimony, defendant Goossen moved for a directed verdict on the ground that there was no evidence of neg-

ligence on his part which proximately caused or contributed to the accident. At that time, Mrs. King also moved for a directed verdict in her favor. She called the court's attention, for the record, to the fact that she rested at the close of plaintiffs' case for the reason that she was satisfied that there was no evidence in the case of any negligence on her part which caused or proximately contributed to the accident. In moving for a directed verdict, she took the position that any testimony adduced by Goossen in his defense to plaintiffs' cases was not testimony against her, inasmuch as she had rested her case prior to the opening of defendant Goossen's case. The motions of both defendants were denied.

1. With reference to the judgment against defendant Goossen, it was a question for the jury to determine whether there was evidence of any negligence on his part which proximately caused or contributed to the accident. The jury found that there was and returned verdicts against him. Reviewing the evidence in the light most favorable to plaintiffs, as required, this court will not set it aside. "The issue of negligence is generally a fact question for the jury to determine." Merritt v. Stuve, 215 Minn. 44, 55, 9 N. W. (2d) 329, 334. See, also, Abraham v. Byman, 214 Minn. 355, 8 N. W. (2d) 231. It is a well-settled rule of this court that a verdict will not be disturbed on appeal if the evidence reasonably or fairly tends to sustain it, even if different persons might reasonably draw different conclusions from the evidence or if the evidence will justify a verdict for either party. Under the facts and circumstances in the case before us, we believe that the evidence reasonably tends to sustain the verdicts and judgments against defendant Goossen.

2. With reference to Mrs. King, it is her position that when plaintiffs rested their cases without making a prima facie case of liability against her there was nothing for her to defend herself against and that she properly rested without offering any testimony, it being her position that the evidence submitted by Goossen in his own defense to plaintiffs' cases against him, after she had rested, was of no moment or consequence to her. She argues that the pur-

pose of Goossen's evidence was not to prove liability on her part as to plaintiffs, but only to prove himself free from liability. Among other things, when Goossen proceeded with his own defense after plaintiffs and Mrs. King had rested, he produced evidence to the effect that Mrs. King told him after the accident that she never saw him. She contends, therefore, that the jury should not be allowed to consider evidence submitted in his own defense to this effect. While we have no way of determining just how much consideration the jury gave to this particular admission on the part of Mrs. King that she never saw Goossen, which testimony was not denied by Mrs. King inasmuch as she had previously rested her case, we believe that the jury could reasonably have found from the evidence submitted, even before plaintiffs and Mrs. King rested, that Mrs. King was jointly negligent in connection with the collision.

An examination of the record up to the time plaintiffs and Mrs. King rested shows that Mrs. King was driving on a level gravel highway, on a bright, clear day, with other members of her family. She was driving about 35 miles an hour up to a quarter of a mile from the intersection, and claims to have reduced her speed to about 25 miles an hour after her father warned her of the dangerous corner. She was driving on a road with which she was unfamiliar. In plain sight, in a field near the northeast corner of the intersection, corn five to six feet high, partially tasseled out, obstructed her view. She admits that she did not see the Goossen car approaching from her right until it was "at least over four or five car lengths" from the intersection. She admits that she did not apply her brakes, although she said they were in good shape. The jury might well have considered that a driver, as in the case of Mrs. King, approaching an intersection with which she was unfamiliar, with her view to the right as she neared the intersection badly obstructed or practically shut off, should have approached such intersection, under the circumstances, very cautiously, with her car under such control as to prevent her from colliding with another vehicle entering the intersection, especially from the right. Furthermore, the jury might very well have found that even after Mrs. King

observed the Goossen car approaching from her right when she was "at least over four or five car lengths" from the intersection she should have applied her brakes so as to try to avoid the collision. It is true she said that she turned to the left in the intersection in an effort to avoid the collision, but the jury could have decided that this was not enough under the circumstances.

This court said in Moore v. Kujath, 225 Minn. 107, 111, 29 N. W. (2d) 883, 886:

"M. S. A. 169.20, subd. 1, relates to the right of way upon approaching an intersection. The first sentence provides:

" 'The driver of a vehicle approaching an intersection shall yield the right of way to a vehicle which has entered the intersection from a different highway.'

"This sentence must be interpreted in the light of all the other provisions of the statute, and particularly in the light of the following sentence, which provides:

" 'When two vehicles enter an intersection from different highways at approximately the same time the driver of the vehicle on the left shall yield the right of way to the vehicle on the right.'

"Obviously, both of the foregoing sentences were placed in the statute by the legislature in an endeavor to promote safety on the highways, and they should be so interpreted. As we view the two sentences, the second one so modifies the first as to require the driver on the left, even though he may reach the intersection first, to yield the right of way to the driver on the right in a situation where the two vehicles would collide were each to continue its course and maintain its rate of speed. To otherwise interpret the law and to arbitrarily give to him who first enters the intersection the right of way over another vehicle approaching at approximately the same time from the right would be to increase rather than diminish the hazards of driving. By *approximately,* the legislature must have meant the approach to an intersection of two vehicles so nearly at the same time that there would be imminent hazard of a collision if both continued the same course at the same speed. In that case, he on the left should yield to him on the right. While

the driver on the left is not required to come to a dead stop, as at a through highway stop sign, unless it is necessary to avoid a collision, he nevertheless must approach the intersection with his car so under control that he can yield the right of way to a vehicle within the danger zone on the right. Such must have been the legislative intent."

Viewing the evidence as to Mrs. King only up to the time she rested in the light most favorable to the verdicts, we conclude that it was sufficient to sustain the judgments against her.

We hold that both defendants were jointly liable for the collision. Judgments affirmed.