938 F.2d 870
 COMMERCIAL PROPERTY INVESTMENTS, INC., a Minnesota
corporation, Appellant,
v.
QUALITY INNS INTERNATIONAL, INC., a Delaware corporation, Appellee.
COMMERCIAL PROPERTY INVESTMENTS, INC., a Minnesota
corporation, Appellee,
v.
QUALITY INNS INTERNATIONAL, INC., a Delaware corporation, Appellant.
 Nos. 90-5541, 90-5542.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 13, 1991.
Decided July 10, 1991.
Rehearing and Rehearing En Banc
Denied Aug. 27, 1991.
 
 George Ludcke, Minneapolis, Minn., argued; George Huwe, Asst. Atty. Gen., St. Paul, Minn., filed an amicus curiae, on behalf of appellant.
 Robert Brunig, Minneapolis, Minn., for appellee.
 Before BOWMAN, Circuit Judge, HEANEY, Senior Circuit Judge, and DUMBAULD,* Senior District Judge.
 HEANEY, Senior Circuit Judge.
 
 
 1
 This diversity action arises from the district court's grant of summary judgment against Commercial Property Investments, Inc. (CPI). Under claims of violation of the Minnesota Franchise Act and common-law fraud, CPI brought this action against Quality Inns International, Inc. (Quality) for damages sustained because of the alleged misrepresentations and omissions of a Quality vice-president. We affirm the grant of summary judgment on the Minnesota Franchise Act claim and reverse the grant of summary judgment on the claim of common-law fraud.FACTS[1]
 
 
 2
 CPI is owned and operated by Jeffrey Nielsen. Quality offers several brands of hotel franchises across the country, including Comfort Inn. Quality employed Walter Francois as its Vice President of Franchise Development. In the fall of 1985, Nielsen contacted Francois with a plan to develop a twelve-acre office complex, including a hotel, in Roseville, Minnesota. Nielsen told Francois that he was interested in either owning and operating the hotel himself or selling the hotel site within the office complex.
 
 
 3
 On November 21, 1985, Nielsen and Francois met to discuss the hotel project. Before the meeting, they drove to and inspected the hotel site, at which time Francois told Nielsen that it was "one of the best sites for a hotel in the Midwest." During the meeting, Francois and Nielsen discussed the option of Nielsen becoming a Comfort Inn franchisee. Francois orally represented to Nielsen that newly constructed Comfort Inns were averaging sixty-eight percent occupancy in their first year of operation and seventy-five percent in their second and third years. In addition, Francois provided Nielsen with a "128-Room Comfort Inn Sample Pro Forma," which reiterated these figures. The pro forma included the following statement:
 
 
 4
 The accompanying financial projections are for illustrative purposes only and are based on estimates and assumptions. No implied or expressed representations are made that these projections actually will be achieved for a specific project.
 
 
 5
 Francois nonetheless emphasized to Nielsen that the occupancy projections were based on historical data and not on estimates or assumptions. Moreover, Francois told Nielsen that the figures were gleaned from "the most sophisticated data base in the industry," and led Nielsen to believe that the occupancy figures were specific to Comfort Inns, when in actuality they were based on industry-wide data.
 
 
 6
 Only five of the Comfort Inns operating within Francois' territory had been open for business for a sufficient time to accumulate occupancy percentage data. Of these five hotels, only one operated at sixty-eight percent occupancy. The other units averaged thirty-eight percent, thirty-nine percent, fifty-three percent, and fifty-three percent. Francois did not inform Nielsen of these numbers. He told Nielsen, however, that a Comfort Inn on Nielsen's site would out perform the average franchise, that the hotel would at least "break even" during the first year, and that in the worst-case scenario, Nielsen would still achieve at least a sixty percent occupancy rate.
 
 
 7
 At the November meeting and in subsequent discussions, Francois informed Nielsen that three neighboring hotels in the Roseville area had occupancy percentage rates ranging from the high seventies to the low nineties, and that Nielsen could expect to achieve similar results after one year of operation. Francois' deposition testimony disclosed that the occupancy rates of the three neighboring hotels benefitted from access to on-the-premises or nearby restaurants. In addition, two of the three neighboring hotels relied heavily on contract business, which results in high occupancy rates but discounted billing. Francois failed to disclose the significance of these features to Nielsen.
 
 
 8
 After the November meeting, Francois continued to court Nielsen. During his presentations, Francois told Nielsen that the nearby Quality Inn Civic Center would complement and improve the occupancy rate of Nielsen's Comfort Inn. At the time of this representation, the Quality Inn Civic Center's occupancy rate was thirty percent, yet Francois told Nielsen that he was "turning the hotel around." Later, while processing Nielsen's franchise application form in February 1986, Francois finally disclosed that the Quality Inn Civic Center was "in bankruptcy [and] will probably withdraw from the system." Francois thus withheld this information from Nielsen until the concluding stages of the negotiations.
 
 
 9
 With regard to operating the hotel, Francois repeatedly emphasized that management of the Comfort Inn would be easy, particularly since no food or beverage services were involved. In addition, Francois assured Nielsen that he personally, as well as Quality, would assist in operating the hotel.
 
 
 10
 In mid-December 1985, Nielsen informed Francois that he would apply for a franchise. While completing the franchise sale, Francois discouraged Nielsen from financing a feasibility or market study before finalizing the deal. According to Nielsen, Francois represented himself as a hotel industry expert who could be relied on to evaluate the project.
 
 
 11
 After Nielsen applied for the franchise, he agreed to a standard Franchise Agreement used by Quality. The Agreement contained the following stipulations:
 
 
 12
 11. ENTIRE AGREEMENT. This Agreement contains the entire agreement of the parties and supersedes any previous agreements and no representation, inducement, promise or agreement, oral or otherwise, not embodied herein, shall be of any force or effect.
 
 
 13
 . . . . .
 
 
 14
 16. TERMINATION OR MODIFICATION BY WRITTEN DOCUMENT. Neither this agreement nor any provisions hereof may be changed, waived, discharged or terminated orally, but only by a written instrument signed by the party against which enforcement of the change, waiver, discharge or termination is sought.
 
 
 15
 . . . . .
 
 
 16
 27. Quality does not represent or guarantee that the Franchised Inn will receive a specified amount or number of reservations through the Quality System, or that the Franchised Inn's reservations or revenue will increase by a specified number, amount or percentage. By its execution hereof, Franchisee represents and acknowledges that it has relied on no representations, written or oral, except to the extent specifically set forth herein.
 
 
 17
 After Nielsen hired a general manager and discussed the budget with him, the manager questioned the accuracy of Francois' projections and the information in the pro forma. The general manager then contacted Francois, who referred him to another Quality employee. This employee told the manager that the figures used by Francois were based on industry-wide data and indicated that the room charge quoted in the pro forma was below the market rate and thus not a profitable one for the type of hotel that Nielsen would be operating. After this information was relayed to Nielsen, Nielsen contacted the Quality employee, who confirmed the manager's report.
 
 
 18
 Nielsen's Comfort Inn opened for business in October 1987. Nielsen quickly discovered that operating a hotel was far more difficult that Francois had represented. Moreover, Francois did not assist Nielsen, and the level of assistance from Quality was not what Francois had promised. During its first year of operation, the hotel's occupancy rate was thirty-three percent. Through 1989, the hotel operated at a loss of more than $830,000, never turning a profit during any year of its existence.
 
 DISCUSSION
 
 19
 CPI argues two issues on appeal: violation of the Minnesota Franchise Act and common-law fraud. In response, Quality argues that its counterclaims were improperly dismissed. Initially, however, we consider a procedural issue raised by Quality.
 
 Appellate Jurisdiction
 
 20
 The district court initially dismissed CPI's action on summary judgment on May 21, 1990. On June 5, 1990, CPI filed a motion requesting the district court to vacate and reverse its May 21 decision. On June 13, 1990, the district court dismissed Quality's counterclaims. On June 19, 1990, CPI filed its notice of appeal
 
 
 21
 from the Order of the United States District Court granting Final Judgment in this action on the 13th day of June, 1990, and which incorporates the Order of the United States District Court granting defendant's motion for Summary Judgment entered in this action on the 21st day of May 1990.
 
 
 22
 On July 25, 1990, the district court denied CPI's June 5 motion to vacate. On August 17, 1990, CPI timely filed another notice of appeal from the final judgment entered by the district court on June 13 and reiterated on July 25.
 
 
 23
 Quality argues that neither CPI's June 19 nor its August 17 appeal specified the May 21 judgment as the particular decision it was appealing. See Fed.R.App.P. 3(c). In this court, "when 'the appeal is otherwise properly taken and the intent of the appellant to appeal from the final judgment is clear, we may treat the appeal as if taken from the final judgment." McGowne v. Challenge-Cook Bros., Inc., 672 F.2d 652, 659 (8th Cir.1982) (citations omitted). Here, CPI timely filed a second notice of appeal after its motion to vacate was denied, see Fed.R.App.P. 4(a)(4), and CPI clearly intended to appeal from the summary judgment dismissal of its claims. We, therefore, have jurisdiction over this appeal.
 
 Minnesota Franchise Act Claims
 
 24
 CPI alleges that Quality violated the Minnesota Franchise Act, Minn.Stat. Sec. 80C.04, subd. 1(p) and Sec. 80C.13, subd. 2 (1986).[2] The district court granted summary judgment on this claim, holding that the Maryland choice-of-law provision in the Franchise Agreement[3] rendered the Minnesota Act inapplicable. The Minnesota Franchise Act contains an antiwaiver clause, which states: "Any condition, stipulation or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of the [Act] ... is void." Minn.Stat. Sec. 80C.21 (1986). A 1989 amendment to this clause clarified that this statute applied to choice-of-law provisions. 1989 Minn.Laws ch. 198 Sec. 2 (May 19, 1989). Moreover, the legislature deemed this amendment to be a "restatement and clarification" rather than a modification of existing law. 1989 Minn.Laws ch. 198 Sec. 3 (May 19, 1989).
 
 
 25
 Based on this legislative action, CPI contends that the Minnesota Franchise Act voids choice-of-law clauses which waive franchisees' rights. In Modern Computer Systems, Inc. v. Modern Banking Systems, Inc., 871 F.2d 734, 738 (8th Cir.1989) (en banc decision, C.J. Lay and J. Heaney dissenting), however, this court held that a choice-of-law provision in a distributorship agreement precluded the application of the Franchise Act's antiwaiver provision. The 1989 amendment does not prevent this precedent from controlling this case. The parties entered into the Franchise Agreement in 1986, while the amendment which corrected this court's decision in Modern Computer Systems did not become effective until 1989. In a similar situation, the Supreme Court of Minnesota held "that we should give this amendment no retroactive significance." Minnegasco, Inc. v. County of Carver, 447 N.W.2d 878, 881 (Minn.1989). While I continue to hold the view expressed in the dissenting opinion in Modern Computer Systems, we are bound by this circuit's en banc ruling and by the Minnesota precedent established in Minnegasco, and therefore hold that the contractual choice-of-law provision precludes the application of the Minnesota Franchise Act in this case.[4]Common-Law Fraud Claim
 
 
 26
 CPI next argues that the district court erred in dismissing its common-law fraud claim on summary judgment. We agree.
 
 A.
 
 27
 In reaching its decision, the district court found that the disclaimers contained in the pro forma and in paragraph 27 of the Franchise Agreement were sufficiently clear and specific to defeat CPI's claims of reliance on the representations made by Francois.[5] "The only situation in which the Minnesota courts have held that a contract provision negatives a claim of fraud is where the provision explicitly states a fact completely antithetical to the claimed misrepresentations." Clements Auto Co. v. Serv. Bureau Corp., 444 F.2d 169, 179 (8th Cir.1971); see also Veit v. Anderson, 428 N.W.2d 429, 433 (Minn.App.1988) (evidencing that the Clements observation is still true today).
 
 
 28
 Our examination of the record reveals that CPI may have relied on misrepresentations which were not squarely contradicted by the written disclaimers. For instance, while the disclaimer in the pro forma focused on the numbers in the document, Nielsen also relied on Francois' oral representation that the numbers in the pro forma reflected the historical average occupancy levels for newly constructed Comfort Inns, although the numbers actually resulted from industry-wide data. CPI thus claims that its reliance went beyond the effectively disclaimed information contained in the pro forma to include the undisclaimed oral representations of Francois. These oral representations occurred at the outset of the sale, creating a fraudulent foundation for the subsequent dealings.
 
 
 29
 The district court also found that paragraph 27 of the Franchise Agreement specifically disclaimed CPI's reliance on the pro forma. Paragraph 27 states:
 
 
 30
 27. Quality does not represent or guarantee that the Franchised Inn will receive a specified amount or number of reservations through the Quality System, or that the Franchised Inn's reservations or venue will increase by a specified number, amount or percentage. By its execution hereof, Franchisee represents and acknowledges that it has relied on no representations, written or oral, except to the extent specifically set forth herein.
 
 
 31
 The first sentence of this disclaimer is irrelevant to CPI's claim of fraudulent misrepresentation. The second sentence is the sort of general disclaimer and integration clause which has been deemed "ineffective to negate reliance." Clements, 444 F.2d at 178-79.[6]
 
 
 32
 Francois' misrepresentations were not limited to embellishing the pro forma information. Francois led Nielsen to believe that the Quality Inn Civic Center would enhance the business of CPI's Comfort Inn. When Francois made this representation, the Quality Inn Civic Center had an occupancy rate around thirty percent and was heading for bankruptcy, yet Francois claimed he was in the process of turning the hotel around. Francois also compared Nielsen's proposed project to three nearby, high-occupancy hotels, although Francois later admitted in deposition testimony that the hotels were not comparable, since two of them relied on contract business to ensure high occupancy and since all of them had easy access to restaurants. Nothing in the pro forma disclaimer or in the Franchise Agreement specifically contradicted these representations. Without such specific contradiction, "a general disclaimer clause is ineffective to negate reliance." Id. at 178. Although a feasibility study might have revealed these differences to Nielsen, Francois dissuaded Nielsen from commissioning such a study and instead persuaded Nielsen to rely on Francois' expertise.
 
 
 33
 Francois also made projections to Nielsen which may constitute fraud because they did not accurately reflect past and present circumstances. See Berg v. Xerxes-Southdale Office Bldg. Co., 290 N.W.2d 612, 615 (Minn.1980) ("Projections should be considered actionable or not in fraud, depending upon whether they accurately reflect surrounding past and present circumstances."). For instance, Francois told Nielsen that he could expect to achieve occupancy percentage rates in the high sixties in the first year and even higher in the second year, and that in a worst-case scenario, the first-year occupancy rate would be at least sixty percent. Francois made these representations although the average occupancy performances of the Comfort Inns in his territory were far below the quoted percentages and although newly constructed hotels typically endure a "stabilization period" before they achieve the occupancy rates advertised by Francois. When Francois told Nielsen that he could expect an occupancy rate in the sixty percent range, he made this "prediction without revealing [these] present fact[s] which could have assisted in determining the accuracy of the prediction." Id. at 615.
 
 
 34
 In sum, Francois repeatedly misrepresented the viability of a Comfort Inn franchise to Nielsen. In this situation:
 
 
 35
 When a promise is not in plain contradiction of a contract, or if contradictory, when it is accompanied by misrepresentations of other material facts in addition to the contradictory intent the question of reliance is for the trier of fact.
 
 
 36
 Johnson Bldg. Co. v. River Bluff Dev. Co., 374 N.W.2d 187, 194 (Minn.Ct.App.1985) (citing General Corp. v. General Motors Corp., 184 F.Supp. 231, 239 (D.Minn.1960)). Summary judgment on the issue of common-law fraud therefore is not appropriate.
 
 
 37
 The district court ruled that a CPI-Commission real estate appraisal report established that CPI's decision to proceed with the project was based on its own investigation and not on Quality's representations. Pursuant to this ruling, the district court held that "even if the alleged fraudulent statements are actionable, and even if reliance upon them was not disclaimed, there is insufficient issue of reliance to survive summary judgment." We disagree with this conclusion for several reasons. First, the question of reliance is for the trier of fact, and thus should not be decided on summary judgment. See id. Second, the report itself explained: "The purpose of this appraisal is to estimate the fair market value of the subject property ... for the purpose of obtaining construction and mortgage financing." The report continued:
 
 
 38
 There has not been a full feasibility study prepared for the proposed construction hotel [sic]. Your appraisers were not hired to prepare a feasibility study on the proposed hotel, but as part of the appraisal process, we did have to address to some extent the feasibility of a new hotel at the subject location.
 
 
 39
 In our opinion, the appraisal did not qualify as the requisite independent investigation necessary to render the misrepresentations irrelevant.
 
 
 40
 [Where] a party to whom a representation has been made has not made an investigation adequate to disclose the falsity of the representation, the party whose misstatements have induced the act cannot escape liability by claiming that the other party ought not to have trusted him.
 
 
 41
 Davis v. Re-Trac Mfg. Corp., 276 Minn. 116, 149 N.W.2d 37, 39 (1967) (citations omitted); see also Hutchinson Utilities Comm'n. v. Curtiss-Wright Corp., 775 F.2d 231, 238-39 (8th Cir.1985). As the appraisal itself indicated, the real estate appraisal was not an adequate investigation to determine the feasibility of the hotel project. Accordingly, the existence of the appraisal does not preclude CPI from claiming that it relied on Quality's representations.
 
 
 42
 The district court also ruled that Francois' omissions were not actionable in fraud. In our opinion, CPI raised a genuine issue of material fact by demonstrating that Francois omitted critical information in making the franchise sale to CPI. Klein v. First Edina National Bank, 293 Minn. 418, 196 N.W.2d 619 (1972), established several exceptions to the general rule that "one party to a transaction has no duty to disclose material facts to the other." 293 Minn. at 421, 196 N.W.2d at 622. Two of the exceptions are relevant here:
 
 
 43
 (a) One who speaks must say enough to prevent his words from misleading the other party. Newell v. Randall, 32 Minn. 171, 19 N.W. 972 (1884).
 
 
 44
 (b) One who has special knowledge of material facts to which the other party does not have access may have a duty to disclose these facts to the other party. Marsh v. Webber, 13 Minn. 109, Gil. 99 (1868).
 
 
 45
 293 Minn. at 421, 196 N.W.2d at 622. Several of Francois' omissions fall under one or the other of these exceptions. For example, the failing status of the Quality Inn Civic Center was not timely disclosed to Nielsen, despite Francois having earlier told Nielsen that this operation would greatly benefit his own Comfort Inn. In addition, when making his occupancy representations, Francois failed to explain to Nielsen the "stabilization period" which newly constructed hotels experience. Similarly, Francois did not reveal the important distinctions, such as contract business and restaurant access, between the neighboring hotels which enjoyed high occupancy rates and the hotel Nielsen contemplated operating. Francois' portrayal of himself as an industry expert on whom Nielsen could rely exacerbates the fraudulent nature of these omissions. Under Minnesota law, these omissions constitute actionable fraud. See Sweeden v. Sweeden, 270 Minn. 491, 500, 134 N.W.2d 871, 877 (1965) ("It is settled law, however, that a statement in a business transaction, which, while stating the truth as far as it goes, the maker knows or believes to be materially misleading because of his failure to state qualifying matter is a fraudulent misrepresentation; ... a statement which contains only those matters which are favorable and omits all reference to those which are unfavorable is as much a false representation as if all the facts stated were untrue." (quoting Borzillo v. Thompson, 57 A.2d 195, 197 (D.C.Mun.App.1948))).
 
 B.
 
 46
 To establish an actionable fraud claim under Minnesota law, CPI must show that Quality
 
 
 47
 made a false representation of a past or existing material fact, susceptible of knowledge, knowing it to be false or without knowing whether it was true or false, with the intention of inducing the person to whom it was made to act in reliance upon it or under such circumstances that such person was justified in so acting and was thereby deceived or induced to so act to his damage.
 
 
 48
 Berryman v. Reigert, 286 Minn. 270, 175 N.W.2d 438, 442 (1970). Our discussion thus far has satisfied each of the listed criteria except the element of damages. While the district court did not address the issue, Quality claims that CPI failed to prove damages. Quality advances several arguments to support its claim. First, Quality contends that CPI waived its right to allege fraud when it failed to rescind its contract promptly as soon as CPI became aware of the misleading nature of Francois' representations. This contention directly contradicts Minnesota law, which states:
 
 
 49
 [W]here a party to a contract has partially performed it before discovering the falsity of the representation which induced him to enter it, he is not obliged to retrace his steps, but may complete performance without waiving the fraud, and then bring an action for deceit.
 
 
 50
 Rosenquist v. Baker, 227 Minn. 217, 35 N.W.2d 346, 349 (1948) (citations omitted). When CPI first became aware of possible fraud by Francois, the hotel was under construction and the first staff members had been hired. CPI therefore was not required to rescind the contract in order to recover damages.
 
 
 51
 Next, Quality argues that it did not proximately cause CPI's damages. Quality generally contends that poor operating procedures caused CPI's losses and specifies several examples thereof. CPI disputes each of Quality's specific examples of poor management and offers evidence to support its rebuttal. Causation constitutes a genuine issue of material fact precluding summary judgment, particularly since Minnesota law requires the jury to determine proximate cause. See Raach v. Haverly, 269 N.W.2d 877, 880 (Minn.1978) ("it was the jury's role to determine whether or not these [fraudulent] statements were the proximate cause of their subsequent losses") (citation omitted).
 
 
 52
 Quality also contends that because CPI's interest in the hotel was transferred to Everest II on March 11, 1988, CPI has no right to recover damages sustained after this date. CPI is a corporation owned solely by Nielsen, while Everest II is a partnership, ninety-nine percent owned by Nielsen and one percent owned by CPI. Everest II has assigned all claims against Quality to CPI in exchange for CPI paying Everest II any damages that CPI recovers from Quality. In Minnesota, "a cause of action arising out of fraud or deceit is not a cause of action for injury to the person, but a cause of action for injury to a property right, and is assignable." Jandera v. Lakefield Farmers Union, 150 Minn. 476, 479, 185 N.W. 656, 658 (1921) (citations omitted); see also Peterson v. Brown, 457 N.W.2d 745, 749 (Minn.App.1990) ("It is well-settled in Minnesota that causes of action for fraud and misrepresentation are assignable.").
 
 
 53
 Quality finally argues CPI did not suffer any out-of-pocket damages, thus precluding compensatory relief. As we have already explained, Minnesota law entitles CPI to be compensated for all damages proximately caused by Quality's misrepresentations. See Raach v. Haverly, 269 N.W.2d 877, 880 (Minn.1978). Under the out-of-pocket damage rule, damages are established at the time of the discovery of the fraud. CPI did not become fully aware of the extent of its damages until the hotel opened for business and CPI realized that Francois' projections were never going to materialize. As for Quality's contention that the real estate appraisal valued the hotel property at a sum which exceeded CPI's investment, we note that the appraisal was based on the inaccurate data supplied by Francois. Had accurate information been used, the appraisal would certainly have been lower. Whether the actual value of the hotel is less than CPI's investment must be determined at trial. At this juncture, CPI has raised a genuine issue of material fact regarding the value of its investment, and thus its claim of damages survives summary judgment.
 
 
 54
 Because Quality is potentially liable for compensatory damages, we address its liability for punitive damages. To recover punitive damages, CPI must demonstrate by clear and convincing evidence that Quality, via its representative, Francois, acted with a deliberate disregard for the rights of others. See Minn.Stat. Sec. 549.20, subd. 1 (1991). While Francois maintains that his representations to Nielsen were his honest opinion and that he did not consider Nielsen a prospective franchisee at the time of their November 21, 1985, meeting, CPI disputes these contentions. CPI argues that Francois knew that Nielsen was considering acquiring a franchise during their initial meeting. Moreover, what Francois considers his honest opinion, CPI argues was misrepresentation, since Francois represented industry-wide data on occupancy rates as being the occupancy rates solely for Comfort Inns. Similarly, CPI notes that Francois represented the neighboring hotels as comparable operations, although he later admitted that he knew that contract business and restaurant accessibility distinguished these hotels from the one Nielsen considered opening. Based on these arguments, CPI has presented enough evidence regarding the willful indifference of Francois for its claim for punitive damages to survive summary judgment.[7]Quality's Counterclaim
 
 
 55
 Quality also challenges the district court's dismissal of its counterclaim. Quality's counterclaim stems from paragraph 27 of the Franchise Agreement, quoted supra. The misrepresentations which CPI attributes to Francois were not contained in the Franchise Agreement. By relying on these misrepresentations to make its case, Quality claims CPI has breached the paragraph 27 language recited above. In addition, Quality claims that by consenting to the above language and then asserting that it has relied on additional representations, CPI has defrauded Quality. This is a meritless claim which encourages us to rule that CPI has injured Quality because CPI did not notify Quality that Quality had defrauded CPI. We refuse to indulge such circular reasoning.
 
 CONCLUSION
 
 56
 We affirm the district court's dismissal of CPI's Minnesota Franchise Act claim and its dismissal of Quality's counterclaim. We reverse the district court's dismissal of CPI's fraud claim, however, and remand the case for further proceedings in accordance with this opinion.
 
 
 
 *
 The Honorable Edward Dumbauld, United States Senior District Judge for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 Because this case comes to us on summary judgment, we consider the facts in the light most favorable to the nonmoving party, CPI. See e.g., Adickes v. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)
 
 
 [2]
 CPI further alleges that Quality violated the corresponding Minnesota rules. See Minn.R. 2860.3500, subd. 14 and Minn.R. 2860.4500(B)(1) & (2), (C)(2) & (3), and (D)(3)
 
 
 [3]
 The Franchise Agreement provides:
 
 
 [19]
 CONSTRUCTION OF FRANCHISE AGREEMENT. This agreement shall be governed and construed according to the laws of the State of Maryland
 
 
 [4]
 CPI further argues that the choice-of-law clause is irrelevant because its Franchise Act claims are based on the fraudulent inducement deployed to convince CPI to enter the agreement rather than on a breach of the Franchise Agreement. It would be incongruous, however, to permit CPI to invoke the Franchise Act to address claims which arose prior to the creation of the franchisor-franchisee relationship when the law prevents the Franchise Act from applying to the Franchise Agreement which cements that relationship
 
 
 [5]
 Despite Quality's objection to the invocation of the Minnesota Franchise Act, it does not object to the use of Minnesota law to resolve CPI's fraud claim. See Financial Timing Publications v. Compugraphic Corp., 893 F.2d 936, 943, n. 7 (8th Cir.1990) ("applying the 'better law' methodology of Milkovich v. Saari, 295 Minn. 155, 203 N.W.2d 408 (1973), would honor the parties' contractual choice of law provision with respect to the breach of warranty claims, but would apply Minnesota law to the fraud claim")
 
 
 [6]
 Our holding on this issue applies to paragraphs 11 and 16, quoted supra at 873. The district court also concluded that these paragraphs did not preclude CPI from claiming reliance on Quality's misrepresentations
 
 
 [7]
 We have reviewed Quality's arguments that Francois was not employed in a managerial capacity by Quality and was not acting in the scope of employment when the alleged fraud occurred precluding punitive damages against Quality. See Minn.Stat. Sec. 549.20, subd. 2(c) (1991). We have also reviewed Quality's contention that the compensatory damages sought by CPI would restore it to the status quo ante and thus would preclude CPI from recovering punitive damages. Neither of these arguments is persuasive