Joseph Jesse RAACH and Patricia Evens Raach, Individually and d.b.a. Piney Ridge Lodge and d.b.a. Piney Ridge Lodge, Inc., Respondents,

v.

Darrell D. HAVERLY and Gloria A. Haverly, d.b.a. Cap'n Dee's Piney Ridge Lodge, Respondents,

Lawrence Dayton and Warren Greeley, Individually and d.b.a. Realty Sales, Appellants.

Nos. 47676, 47738.

Supreme Court of Minnesota.

Aug. 11, 1978.

Rehearing Denied Oct. 5, 1978.

Plattner & Milligan, Walker, Briggs & Morgan and John R. Kenefick, St. Paul, for appellants.

Carroll, Cronan, Roth & Austin and Timothy W. Waldeck, Minneapolis, for Raach and Raach.

Powell, Drahos, Baer & Anderson, Bemidji, for Haverly and Haverly.

Heard before SHERAN, C. J., PETERSON, and SCOTT, JJ., and considered and decided by the court en banc.

SCOTT, Justice.

This is an appeal from an order of the Cass County District Court denying appellants' motion for judgment notwithstanding the verdict or a new trial and from the underlying judgment in favor of respon-

dents for $150,000.[1] Appellants are real estate agents who were found liable by a jury for misrepresentations made during the sale of a resort in Crow Wing County. We affirm the actions of the trial court.

Darrell D. Haverly and his wife bought the resort, which they named "Cap'n Dee's Piney Ridge Lodge," in 1965 from a man named Roberts, whose real estate agent was Lawrence Dayton. They ran it successfully until 1972, doubling the gross business, adding many improvements, and becoming accredited by a number of agencies which evaluate resorts. In 1969 they attempted to sell the business, but received no offers; Dayton advised them to continue building up the gross. In 1972 they decided to try again. Haverly and Dayton set a firm price of $395,000, and Dayton put ads in various newspapers.

Joseph J. Raach, comptroller of a corporation in Missouri, saw an ad for the resort in the *Kansas City Star*. Early in May, 1972, he called Dayton. Dayton told Raach, among other things, that the property consisted of 107 acres, with a half-mile of lakeshore. Raach decided to visit the resort, where Dayton repeated that there were 107 acres of land and approximately one-half mile of shoreline, which was allegedly worth $75–$150 per front foot. At this time Dayton's own knowledge of the size of the property was as follows: in 1964 or 1965 he had seen a map indicating that the property was 60–80 acres, but he thought that since then the Haverlys might have added some land.[2] Raach was concerned with possible resale of the land because he expected to recoup his investment by that means if he proved unsuccessful as a resort operator. Dayton told him the land could

be resold, although what was said about the possibility of subdividing it is not entirely clear.[3] Haverly showed Raach around the property and discussed the resort business with him, but made no mention of acreage or the length of the shoreline.[4]

Raach came back with his wife and children on May 11. He testified that on this trip he told Dayton and Haverly that he thought Piney Ridge Lodge would be a good investment because, if he ran into trouble, he would have " 'over a quarter of a million dollars in land.' " They were silent on that point, according to Raach, but discussed the business aspects of the resort with him in greater detail. On May 20, Raach returned with his attorney, examined the books and made a purchase offer. After some negotiation an agreement was reached whereby Raach was to pay $395,-000, with $80,000 down and $26,000 due each October 1. The Raachs took possession on June 1, 1972, and immediately began to have difficulty running the place.

Rising costs and taxes compounded problems created by the Raachs' inexperience. Although they borrowed $55,000 from the Small Business Administration to make some improvements, and although the Raachs each worked well over a hundred hours a week in peak season, the gross business fell to $77,000 in 1974 (from the Haverlys' high of $120,000 in 1971), and the resort lost its Triple A rating. In September 1974, Raach began to think about selling some land. It was then that he discovered that the property was only about 60 acres and had closer to one-fourth than one-half mile of shoreline.[5] This discovery led to a number of legal actions.

1. The jury awarded respondents $292,000, which was reduced by remittitur.

2. The resort property is divided by a road. On the lake side there are about 30 acres; on the other side, a number of acres—which proved also to be about 30—of dubious value, containing a swamp.

3. The amount of shoreline would be a key factor here because local zoning ordinances require 100 feet of shoreline in each lot.

4. This is Raach's recollection; according to Haverly, he and Raach estimated the shoreline to be about 2000 feet.

5. A survey done during litigation showed approximately 62 acres and 1575 feet of shoreline.

The Raachs had made their 1972 and 1973 payments of $26,000 each. In October 1974, however, instead of making the 1974 payment they brought suit for misrepresentation against the Haverlys in Federal district court, requesting that cancellation of their contract for deed be enjoined and that they be awarded $240,000 in damages. The parties tried to reach a settlement, but failed; on March 30, 1976, District Judge Miles W. Lord transferred the case to Cass County District Court. Meanwhile, the Haverlys had proceeded through statutory cancellation proceedings and an action for unlawful detainer, resulting in an order which allowed them to repossess Piney Ridge Lodge on July 25, 1975. Lawrence Dayton and his partner Warren Greeley also became the defendants in a suit, initiated in Cass County District Court on March 4, 1975, which alleged that their misrepresentations had induced the Raachs' purchase. The Raachs' actions against the realtors and the Haverlys were consolidated, and the defendants brought third-party actions against each other for indemnification.

The trial judge required the Raachs to elect a remedy, and they chose to proceed in tort, claiming fraud. Testimony at trial brought out the facts recited above, plus, with respect to damages, descriptions by Haverly and his son of substantial deterioration in the property during the Raachs' ownership. The jury was given four verdict forms to enable it to find for plaintiffs against both sets of defendants, for plaintiffs against either set of defendants, or for all defendants. The jury found against Dayton and Greeley, who raise what are essentially three issues on appeal.

■ First, we feel that the evidence was sufficient to sustain the verdict, if viewed in the light most favorable to that verdict. *Waite v. American Creosote Works, Inc.*, 295 Minn. 288, 204 N.W.2d 410 (1973); *Delyea v. Goossen*, 226 Minn. 91, 32 N.W.2d 179 (1948). Dayton's representations were demonstrably false, and it was within the

province of the trier of fact to decide whether or not the Raachs relied on his statements as to the size of the property. *Blasing v. P. R. L. Hardenbergh Co.*, 303 Minn. 41, 226 N.W.2d 110 (1975). There is no doubt that these inaccurate statements were material; indeed, both Mr. and Mrs. Raach testified that they would not have bought the property had they known its true size. Further, it was the jury's role to determine whether or not these statements were the proximate cause of their subsequent losses. *Lutz v. Lilydale Grand Central Corp.*, Minn., 250 N.W.2d 599 (1977).

■ Second, to support the contention that the cancellation of the contract for deed precludes a tort action for fraud, appellants rely heavily on *Olson v. Northern Pac. Ry. Co.*, 126 Minn. 229, 148 N.W. 67 (1914). That case concerned a contract to sell agricultural land in Montana, by the terms of which the vendee was required to make a down payment of $464, to make ten annual payments of $417, and to cultivate the land. The down payment was made, but thereafter the vendee made no further payments, nor did he begin to cultivate the property. After three years the vendor terminated the contract. We held this cancellation cut off the vendee's right to recover damages for misrepresentation from the vendor. See also, *West v. Walker*, 181 Minn. 169, 231 N.W. 826 (1930). As appellants point out, a number of decisions since *Olson* have attempted to soften the *Olson* doctrine by suggesting alternative remedies for defrauded vendees.[6] We do not reach the question of whether the *Olson* doctrine should, in the proper case, still be applied today, as the present situation is clearly distinguishable. Appellants here are not vendors, but agents, asking that *Olson* be extended to shield them from liability even though they were not parties to the cancelled contract.

To apply *Olson* in this manner would conflict with a much more recent line of cases holding that real estate agents may

---

**6.** For example, payments made prior to cancellation of a contract for deed may be recovered under a theory of unjust enrichment. *Gable v.*

*Niles Holding Co.*, 209 Minn. 445, 296 N.W. 525 (1941). See also, *Zirinsky v. Sheehan*, 413 F.2d 481 (1969).

be found liable for misrepresentations even when their principals escape liability. *Berryman v. Riegert*, 286 Minn. 270, 175 N.W.2d 438 (1970); *Sawyer v. Tildahl*, 275 Minn. 457, 148 N.W.2d 131 (1967). These decisions reflect the development of real estate brokerage as a profession since the time of *Olson*. In *Berryman*, the expertise of the realtor—and the vendee's justifiable reliance on that specialized knowledge—were discussed as the basis of the agent's independent liability for misstatements. Appellants here do 90 percent of their business in the field of resort sales. Respondents, on the other hand, were completely inexperienced in this area and were entitled to rely heavily on the statements of appellant Dayton. These statements having proven false, the cancellation of the contract between the Raachs and the Haverlys simply has no bearing on appellants' liability for making them.

▮ Nor do the Haverlys incur imputed liability for these statements. The present case is dissimilar to *Swanson v. Domning*, 251 Minn. 110, 86 N.W.2d 716 (1957), where a principal was forced to disgorge benefits obtained under a contract fraudulently induced by an agent. Here, although the Haverlys did end up with both the Raachs' payments of $132,000 and the lodge itself, when they repossessed the lodge it had been substantially damaged both as a business and as a piece of real estate. It was up to the jury to weigh the testimony concerning the value of the lodge at the time of repossession, and to decide, then, whether the Haverlys actually retained "benefits" under the contract. Clearly the jury determined that under the circumstances the Haverlys had not received a windfall.

▮ Finally, it is urged that the trial court incorrectly instructed the jury as to the measure of damages.[7] We disagree.

Appellants' argument that this instruction was defective runs, briefly, as follows: in fraud actions, Minnesota follows the "out-of-pocket-loss" rule with respect to damages. *Jensen v. Peterson*, 264 N.W.2d 139 (Minn.1978). Where a purchase is involved, normally this rule will be applied by subtracting from the amount plaintiff paid, the value of what was received. *Lehman v. Hansord Pontiac Co.*, 246 Minn. 1, 74 N.W.2d 305 (1955); *Marion v. Miller*, 237 Minn. 306, 55 N.W.2d 52 (1952); *Nelson v. Gjestrum*, 118 Minn. 284, 136 N.W. 858 (1912). This is the method of computing damages which apparently was approved in *Berryman, supra,* and *Sawyer, supra,* cases involving false representations by real estate agents. Appellants claim this rule could not have been followed by the jury here because the record did not indicate the true value of Piney Ridge Lodge at the time of the Raachs' purchase.

▮ On the other hand, the out-of-pocket-loss rule has often been described as one capable of very flexible application to individual cases. *Tysk v. Griggs*, 253 Minn. 86, 91 N.W.2d 127 (1958); *Townsend v. Jahr*, 147 Minn. 30, 179 N.W. 486 (1920). Many cases could be cited which follow the approach taken in *Townsend*, wherein it is stated that "[t]he one general principle of

7. The instruction was as follows: "Now, damages in the case of fraud or misrepresentation are the actual out of pocket loss sustained by a plaintiff as a direct or proximate result of the defendants' fraud, and the plaintiffs' reliance thereon, subject to possible set-offs.

"In this particular case the plaintiffs' damages could include the down payment, additional payments made by the plaintiffs, the cost of improvements, if any, and any other expenses or payments made by the plaintiffs during their time of possession, and the reasonable value of their labor during the time of possession, less—and when I start using the word less, then I am talking about possible set-offs—less the reasonable value of the premises, less the reasonable value of any other benefits received by the plaintiffs while in possession, less any damage done by plaintiffs or their agents or employees to the premises or personal property which was the subject of the contract exclusive of ordinary wear and tear, and, finally, less any loss which could have been prevented by reasonable care and diligence of plaintiffs.

"The damage sustained by the plaintiffs need not have been contemplated by the defendants. Any set-off loss sustained by the defendants need not have been contemplated by the plaintiffs. Put it another way, the plaintiffs, if entitled to recover at all, may recover the difference, if any, between what they parted with and what they received."

universal application is that the party guilty of the fraud is liable to respond in such damages as naturally and proximately resulted from the fraud." 147 Minn. 32, 179 N.W. 487. See, e. g., *Lewis v. Citizens Agency of Madelia, Inc.*, 306 Minn. 194, 235 N.W.2d 831 (1975); *Rosenquist v. Baker*, 227 Minn. 217, 35 N.W.2d 346 (1949). One example of this flexibility of the rule is that consequential damages which were not contemplated by the parties at the time of the sale may be taken into account. *Lowrey v. Dingmann*, 251 Minn. 124, 86 N.W.2d 499 (1957). Here the value of the Raachs' labor may have been considered as such an item.

■ Moreover, there is room for doubt as to whether an objection to the damage instruction was properly preserved for appeal. This objection was not made at trial, so unless an error of "fundamental law or controlling principle" was made appellants' disagreements with the instruction were waived. Rule 51, Rules of Civil Procedure; *LaValle v. Aqualand Pool Co., Inc.*, 257 N.W.2d 324 (Minn.1977). Moreover, if there were a fundamental error, it would nevertheless have had to be preserved in the post-trial motion. *Baldwin v. Chicago & N. W. Ry.*, 285 Minn. 15, 171 N.W.2d 89 (1969). Appellants' motion on this point read as follows:

> "3. That errors of law occurred at the trial and were objected to at the time, including errors in the instructions with respect to fundamental law and controlling principles;"

In *Moosbrugger v. McGraw-Edison Co.*, 284 Minn. 143, 157, 170 N.W.2d 72, 81 (1969), we held that "[a]n assignment of error, to be valid, must point to a specific error of law and cannot be vague and indefinite." It is doubtful that appellants' post-trial motion could meet that standard. However, since we feel the trial court's instruction was sound, we do not pursue this point further.

Affirmed.

TODD, J., took no part in the consideration or decision of this case.