**COMMERCIAL PROPERTY INVESTMENTS, INC., a Minnesota corporation, Appellee,**

v.

**QUALITY INNS INTERNATIONAL, INC., a Delaware corporation, Appellant.**

No. 94–2509.

United States Court of Appeals, Eighth Circuit.

Submitted March 13, 1995.

Decided July 31, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied Sept. 20, 1995.*

* Murphy, Circuit Judge, took no part in the con-   sideration or decision of this case.

Kirk W. Reilly, Minneapolis, MN, argued (Lawrence R. Commers and Joanne H. Turner, on the brief), for appellant.

George O. Ludcke, Minneapolis, MN, argued (Keith J. Nelsen, on the brief), for appellee.

Before MAGILL, Circuit Judge; HEANEY, Senior Circuit Judge; and MORRIS SHEPPARD ARNOLD, Circuit Judge.

HEANEY, Senior Circuit Judge.

This matter comes before the court for the second time. The action arose when Commercial Property Investments, Inc. ("CPI") brought suit against Quality Inns International, Inc. ("Quality") for damages incurred due to alleged misrepresentations and omissions made by a Quality vice president. CPI alleged that Quality's fraudulent conduct, which occurred during and subsequent to discussions concerning the sale of a hotel franchise to CPI, violated the Minnesota Franchise Act and Minnesota common law. Our court affirmed the district court's grant of summary judgment on CPI's Minnesota Franchise Act claim and reversed the court's grant of summary judgment on CPI's common-law fraud claim. *See Commercial Property Inv., Inc. v. Quality Inns Int'l, Inc.*, 938 F.2d 870, 871 (8th Cir.1991) (*CPI I*).

On remand, a four-week jury trial was held on CPI's common-law fraud claim. The jury returned a verdict in CPI's favor and awarded compensatory damages in the sum of

$796,056. The court subsequently added prejudgment interest to the jury award, bringing the total award to $1,028,624. Quality's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial was denied. Quality now appeals. Because our first opinion sets forth the facts in considerable detail, we need not reiterate them here.

Quality argues that (1) the district court erred in instructing the jury about the effect of a written disclaimer on CPI's reliance on certain oral misrepresentations by Quality; (2) the district court erred in denying Quality's motion for judgment notwithstanding the verdict or, alternatively, for a new trial because there was insufficient admissible evidence of actionable misrepresentation or justifiable reliance to support a finding of fraud; and (3) CPI failed to meet its burden of proving damages because no evidence was introduced at trial that established CPI's loss at the time it discovered the fraud in June 1987. We affirm.

### I. The Jury Instruction

■ Quality first assigns error to the district court's jury instruction regarding a disclaimer included in a pro forma document that Walter Francois, Vice President of Franchise Development for Quality, gave to Jeffrey Nielsen, CPI's owner and operator. The pro forma, which showed occupancy percentages, average daily rates, and gross and net income for the first three years of a new 128–room Comfort Inn, included the following disclaimer:

> The accompanying financial projections are for illustration purposes only and are based on estimates and assumptions. No implied or expressed representations are made that these projections actually will be achieved for a specific project.

Jt.App. at 323. With regard to the disclaimer, the district court instructed the jury as follows:

> A disclaimer in a contract will only negate a claim of fraud where the disclaimer explicitly states a fact completely the opposite of the claimed misrepresentations.
>
> As to plaintiff's Exhibit #3, the pro forma, the numbers contained therein are effectively disclaimed. But, as to the claim that CPI's reliance went beyond the effectively disclaimed information in the pro forma to include the oral representations of Walter Francois, if any, they are not disclaimed.
>
> If you find that CPI relied on misrepresentations which were not squarely contradicted by the written disclaimer, *you must find the disclaimer ineffective to negate reliance.*

Jt.App. at 304 (emphasis added). Quality argues that by charging the jury that it *"must find* the disclaimer ineffective to negate reliance" the court removed from the jury's province the fact issue of whether CPI justifiably relied on oral misrepresentations by Quality. Stated somewhat differently, Quality argues that the instruction precluded the jury from considering the effect of the written disclaimer on CPI's reliance on oral misrepresentations Francois made to Nielsen.

The instruction was discussed extensively at a jury conference in which both parties actively participated. During the conference in response to the court's statement of intent to include the language, Quality's counsel stated:

> I think the last parenthetical, your instruction that you must find the disclaimer ineffective to negate reliance, I think that is a factual determination. That is, the jury is entitled to try to determine whether or not there was ... reliance—

Feb. 2, 1994, Trial Tr. at 125–26. The court responded to Quality's concern, noting that the proposed language properly left the issue of reliance for the jury's consideration. In addition, the court noted that a separate instruction on fraud and misrepresentation adequately discussed the issue of justifiable reliance.[1] *Id.* at 127. At the conclusion of

---

1. The relevant portions of the instruction on fraud and misrepresentation read as follows:
   Fraud is a false representation of a past or present material fact made for the purpose of inducing another person to part with something of value. The representation may be spoken or in writing.

the charge conference the court inquired of Quality's attorney whether there were additional instructions Quality wished to include. Counsel responded: "Well, Your Honor, usually we have a few that we would like. Unfortunately, I think that ... the instructions look pretty good as they stand." *Id.* at 142. After discussing an additional instruction, the court asked counsel once more: "Does the defense have something more?" *Id.* at 143. Quality's attorney responded: "We do not." *Id.*

Following closing arguments, the court held a conference with counsel in chambers to discuss any additional language the parties wished to include in the instructions. CPI's attorney requested additional language in an instruction regarding the time of discovery of the fraud. Counsel for Quality requested no additional instructions. At a bench conference immediately thereafter the court again invited the parties to raise any additional concerns they had about the instructions: "Remembering that your requested instructions and objections are of record, do you have any further requested instructions, or further requested objections?" Counsel for both parties responded negatively to the court's question. Feb. 3, 1994, Trial Tr. at 83.

■ As the record shows, at no time during the charge conference or after closing argument did Quality's attorney challenge the instruction on the ground it raises on appeal—that the instruction precluded the jury from considering the written disclaimer in deciding the issue of reliance. At most, Quality's comment during the charge confer-

ence that "the jury is entitled to try to determine whether or not there was ... reliance" can be construed as an alternative instruction. We have held, however, that merely tendering an alternative instruction without objecting to some specific error in the trial court's charge or explaining why the proffered instruction more accurately states the law does not preserve the error for appeal. *Johnson v. Houser,* 704 F.2d 1049, 1051 (8th Cir.1983). Rule 51 of the Federal Rules of Civil Procedure requires a specific objection before the jury retires when the district court rejects a requested instruction. *Barton v. Columbia Mut. Cas. Ins. Co.,* 930 F.2d 1337, 1341 (8th Cir.1991). Error in instructions not properly objected to is waived unless the error is plain error, *e.g.,* error resulting in a miscarriage of justice. *Johnson,* 704 F.2d at 1051. "When reviewing instructions for plain error, this court has stated that the district court has discretion in the style and wording of jury instructions so long as the charge as a whole fairly and adequately states the law." *Beckman v. Mayo Found.,* 804 F.2d 435, 438 (8th Cir. 1986). Because Quality did not specifically raise the issue before the district court it now raises on appeal, we find that Quality has waived its right to object to the court's instruction.

■ Even assuming that Quality properly preserved its objection to the instruction, we find no error in the court's instruction. Viewed alone, the instruction is compatible with our statement of Minnesota law in *CPI I* [2] in which we held that the question of

---

For fraud to be established, all of the following five elements must exist:
1. Defendant made one or more false representations to the plaintiff of a past or present material fact.

....

3. The false representations were made with the intention to induce the plaintiff *to act in reliance upon them, or the representations were made under circumstances where the plaintiff was justified in relying on them. In determining whether reliance is justified you may consider the relationship between the parties and any disparities in knowledge between the parties.*
4. *The plaintiff believed the representations and relied and acted upon them.*

5. *Plaintiff suffered damages as a direct result of such reliance and action.*
   If you find that there was one or more fraudulent misrepresentations the plaintiff was not obligated to make any investigations regarding the falsity; but plaintiff is not justified in relying upon the truth of the representations if their falsity was obvious.
Jt.App. at 289–90 (emphasis added).

**2.** We stated in *CPI I* that:

"When a promise is not in plain contradiction of a contract or, if contradictory, when it is accompanied by misrepresentations of other material facts in addition to the contradictory intent, the question of reasonable reliance is one for the trier of fact."

644

reliance is one for the trier of fact. Consistent with our holding, the district court charged the jury that *if it found that CPI relied* on misrepresentations that were not squarely contradicted by the written disclaimer, it must find the disclaimer ineffective to negate reliance. The disclaimer instruction logically followed the court's instruction on fraud and misrepresentation, which discussed rather extensively the issue of justifiable reliance. The instruction, as we read it, in no way precluded the jury from considering the impact of the disclaimer on CPI's reliance, but rather, consistent with our summary of Minnesota law in *CPI I*, instructed the jury that a written disclaimer cannot operate to nullify a claim of fraud where claimed misrepresentations are not explicitly contradicted by the disclaimer.[3]

## II. The Sufficiency of the Admissible Evidence

Quality next contends that CPI's complaint failed to allege fraud with sufficient particularity to satisfy the requirements of Rule 9(b) of the Federal Rules of Civil Procedure. Accordingly, it argues the district court erred in denying Quality's motion for judgment notwithstanding the verdict or, alternatively, for a new trial because allegations set forth in CPI's Third Amended Complaint ("the complaint") were insufficient to support a claim of fraud.

■ A motion for judgment notwithstanding the verdict (now motion for judgment as a matter of law)[4] presents the legal question of "whether there is sufficient evidence to support a jury verdict." *White v. Pence*, 961 F.2d 776, 779 (8th Cir.1992). When reviewing a district court's ruling on a motion for judgment notwithstanding the

verdict, we review "the evidence in the light most favorable to the prevailing party and must not engage in a weighing or evaluation of the evidence or consider questions of credibility." *Id.* Judgment notwithstanding the verdict is appropriate only when all the evidence points one way and is "susceptible of no reasonable inference sustaining the position of the nonmoving party." *Id.* We apply a more deferential standard in our review of a district court's denial of a motion for a new trial: The denial of a motion for a new trial is within the sound discretion of the district court, and its ruling will not be reversed unless there is a clear abuse of discretion. *McKnight v. Johnson Controls, Inc.*, 36 F.3d 1396, 1400 (8th Cir.1994); *Ryko Mfg. Co. v. Eden Serv.*, 823 F.2d 1215, 1221–22 (8th Cir. 1987), *cert. denied,* 484 U.S. 1026, 108 S.Ct. 751, 98 L.Ed.2d 763 (1988).

■ Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." " 'Circumstances' include such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Bennett v. Berg*, 685 F.2d 1053, 1062 (8th Cir.1982), *adhered to on reh'g,* 710 F.2d 1361 (8th Cir.) (en banc), *cert. denied,* 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983). Because one of the main purposes of the rule is to facilitate a defendant's ability to respond and to prepare a defense to charges of fraud, *Greenwood v. Dittmer,* 776 F.2d 785, 789 (8th Cir.1985), conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule. *In re Flight Transp. Corp. Sec. Litig.,* 593 F.Supp. 612, 620 (D.Minn.1984).

938 F.2d at 876 (quoting *Johnson Bldg. Co. v. River Bluff Dev.*, 374 N.W.2d 187, 194 (Minn.Ct. App.1985)).

3. We note that the court's instruction is virtually identical to language we used in *Clements Auto Co. v. Serv. Bureau Corp.*, 444 F.2d 169 (8th Cir.1971), in which, interpreting an early case by the Minnesota Supreme Court discussing scienter in a fraud action, we stated that "a general disclaimer clause is ineffective to negate reliance on even innocent misrepresentations." *Id.* at 178.

4. As noted in *Keenan v. Computer Assocs., Int'l, Inc.,* 13 F.3d 1266, 1268 n. 2 (8th Cir.1994) and *McKnight v. Johnson Controls, Inc.,* 36 F.3d 1396, 1400 n. 1 (8th Cir.1994), a motion for judgment as a matter of law "now encompasses all motions denominated as motions for a directed verdict or for judgment notwithstanding the verdict." *See* Fed.R.Civ.P. 50 (commentary to 1991 Amendment).

Quality does not dispute that CPI properly pleaded the time, place, and contents of the misrepresentations alleged to be fraudulent. *See* Jt.App. at 62; Supp.App. at 39. Rather, Quality contends that the district court improperly "allowed the admission of evidence of myriad representations [that were] not pleaded." Appellant's Br. at 26. It cites the following as examples of representations that were not pleaded: (1) Francois claimed to be an officer of Quality; (2) Francois misrepresented his involvement in developing the prototype for the Comfort Inn construction; (3) Francois exaggerated the number of Comfort Inns then existing and on the drawing board; (4) Francois misrepresented the need for a bar or restaurant near the hotel; (5) Francois misled CPI about its abilities to manage the hotel on its own; (6) Francois misrepresented the expense portion of the pro forma; and (7) Francois misrepresented the source of the occupancy figures in the pro forma.[5] *Id.* at 26–27. Quality argues that this information was grossly prejudicial because Francois died nearly two years before trial and thus could not counter these allegations at trial. Relying on our holding in *Greenwood, supra,* it argues the district court erred in allowing the admission of these representations at trial.

We reject Quality's arguments for two reasons. First, Francois had ample opportunity to respond to the representations prior to trial. Francois' deposition was taken in February 1992 (two years before trial commenced) to preserve his testimony for trial. During the deposition, Francois was specifically asked about the subject matters of each of the above representations. *See* Walter Francois Depo., Feb. 4, 1992, at 38–39, 85, 107, 108, 126–29, 164–69, 177–80. Quality, thus, plainly had an opportunity to explore Francois' position on these issues.

Second, although perhaps lacking in some specifics that were later developed at trial, CPI's complaint stated with sufficient particularity the fraudulent misrepresentations and omissions that formed the basis of CPI's common-law fraud claim. CPI specifically averred the following in its complaint, *see* Jt.App. at 1–11:

1. Francois was an authorized agent of Quality.

2. In 1985 and 1986, Francois offered to sell Nielsen/CPI a Quality Inns franchise for a new Comfort Inn Motel to be constructed on property in Roseville, Minnesota. In the course of their discussions, Francois represented to Nielsen that he had substantial experience in evaluating potential motel franchise operations, including relevant financial aspects of new motel franchise operations. Francois knew that Nielsen did not have prior experience in the motel business and that, in determining whether to purchase the franchise, Nielsen was relying on Francois' claimed expertise.

3. Francois advised Nielsen/CPI there was no need to hire an outside consultant to advise Nielsen/CPI regarding the venture and that Francois would provide the necessary expertise.

4. Francois further advised Nielsen/CPI that in the event a financing forecast was required, Francois should be contacted first so that he could provide information to influence the forecast.

5. Francois repeatedly represented that the Comfort Inn at the Roseville location would have a first-year occupancy rate of 67 to 70 percent, and that, in a worst case scenario, it would have an occupancy rate of at least 60 percent.

6. Francois stated that the motel would at least break even during the first year of operation.

7. Francois further represented that the Comfort Inn would have an occupancy rate that would equal or exceed the performance of other specific hotel/motel operations in the Roseville area, which had occupancy rates in the high 70's to 90 percent range.

8. Francois failed to state that motel franchise operations of the sort contemplated by the parties typically neither achieve a 60

---

5. CPI notes that numbers (1) and (2) of the misrepresentations Quality claims were not specifically pleaded, in fact, were never claimed as fraudulent misrepresentations by CPI at trial. Appellee's Br. at 37.

percent occupancy rate nor break even in the first year.

9. Francois provided CPI with a document entitled "128–room Comfort Inn Sample Pro Forma," which included projections for the first three years of operation of a Comfort Inn of similar size to the Comfort Inn being considered by Nielsen/CPI.

10. At no time did Francois or Quality provide Nielsen/CPI with a statement setting forth the assumptions or data upon which the estimations or projections in the pro forma were based, or indicate the number of operations involved, the length of time the operations were in business, the period covered by the data, and the ownership status of the operations.

11. In October 1987, CPI opened and began operating the Comfort Inn Motel under the Franchise Agreement it entered into with Quality.

12. In March 1988, CPI's interest in the Comfort Inn was transferred to Everest II, a general partnership and affiliate of CPI. Although CPI and Everest II made reasonable efforts to successfully operate the motel, they experienced a net loss in excess of $50,000 during the first year of operation.

13. The occupancy rate of the motel during its first year of operation was 33.7 percent. During the second year of operation, Everest II experienced additional losses in excess of $50,000.

Consistent with the Rule 9(b)'s purpose of facilitating a defendant's response to and preparation of a defense to charges of fraud, the complaint adequately apprised Quality of the claims against it and the factual grounds upon which the claims were based.

Quality relies on our decision in *Greenwood, supra,* for the proposition that misrepresentations not specifically pleaded cannot be considered in deciding whether there is sufficient evidence to sustain an action in fraud. We decline to interpret *Greenwood,* whose holding is limited to the specific facts in that case, as broadly as Quality does. In *Greenwood,* the plaintiff brought an action

against a commodity brokerage business and its agents under the Commodity Exchange Act, 7 U.S.C. § 6b, for common-law fraud and breach of the firm's fiduciary duties. Greenwood's complaint alleged that brokers at the firm advised him to take short positions on certain feeder cattle contracts on the assurance that the firm's president was pursuing a similar strategy when in fact the president was taking a long position on the market. 776 F.2d at 789. The complaint further alleged in conclusory fashion that "the defendant, through its agents, made untrue statements of material facts or omitted or failed to state material facts necessary to make other statements not misleading." *Id.* We held that Greenwood's latter, conclusory allegation was not stated with sufficient particularity to satisfy the requisites of Rule 9(b) and, thus, concluded that the district court's grant of the defendant's judgment notwithstanding the verdict should have been made only with reference to the former allegation. *Id.* Based on record evidence that the brokers who advised Greenwood themselves elected to take short positions in the feeder cattle market, we agreed with the district court that "'[i]t is hardly open to dispute that had these brokers known or suspected their advice to be erroneous, they would not have been risking their personal accounts....'" *Id.* (quoting *Greenwood v. Dittmer,* 596 F.Supp. 235, 239 (W.D.Ark. 1984)). Accordingly, we held that the mere fact that the brokers' opinions concerning the feeder cattle market turned out to be erroneous was, standing alone, insufficient to support a fraud judgment. *Id.* at 790.

In contrast to Greenwood's paltry complaint, CPI's complaint unambiguously stated the core of CPI's claims against Quality and the factual grounds upon which its claims were based. The allegations in CPI's complaint, far from being conclusory, stated with particularity the various misrepresentations and omissions by Quality that CPI alleged constituted fraud. These allegations were more than adequate to support the jury's judgment in CPI's favor.[6] Accordingly, we

---

6. Our holding is consistent with the district court's holding in its order denying CPI's motion *in limine* that "[n]ot every alleged misrepresenta-

tion must be included in the pleadings." Jt.App. at 165. Prior to trial, CPI moved to exclude from evidence certain misrepresentations and

find that the district court did not err in denying Quality's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial.

### III. Damages

Lastly, Quality argues that there was no evidentiary basis for the jury's award of damages. Quality contends that CPI was on notice of Quality's misrepresentations as early as June 1987; thus the jury's award of damages based on evidence of the value of CPI's hotel franchise as of January 1, 1988 and July 1, 1989 was founded on pure speculation since no evidence was introduced at trial of CPI's initial out-of-pocket damages as of June 1987.[7]

█ Before addressing the merits of this claim, we find it necessary to correct the district court's apparent misapplication of Minnesota's out-of-pocket loss rule. Ordinarily the doctrine of the law of the case precludes such an effort on our part where, as here, neither party has challenged the relevant jury instruction. In this case, however, it is evident that the error, shared by the district court and the parties, stemmed from their interpretation of certain dicta in our earlier decision in *CPI I*. To avert any further confusion, we are obliged to set forth what we believe to be the contours of Minnesota's out-of-pocket loss rule.

█ In cases of fraud and misrepresentation, Minnesota has adopted the minority "out-of-pocket loss" rule for the compensability of damages, rather than the more expansive "benefit-of-the-bargain" rule. Minnesota courts have nevertheless taken a broad view of what constitutes out-of-pocket losses, holding that the rule permits the recovery of consequential damages proximately caused by the misrepresentation. In the context of

real estate fraud, the rule has recently been summarized thus:

> Where ... the purchaser claims that the seller's fraudulent misrepresentation induced the formation of a contract but the purchaser does not seek return of the property, Minnesota adheres to the 'out-of-pocket rule,' which measures damages as the difference between what the defrauded party paid and what he or she actually received, together with other damages proximately caused by the fraud.... More precisely, in cases involving a fraudulent misrepresentation to a buyer of real estate, the measure of damages is the amount paid less the fair market value of the property.

*Nave v. Dovolos,* 395 N.W.2d 393, 398 fn. 1 (Minn.App.1986) (citations omitted). *Accord Johnson Bldg. Co. v. River Bluff Development,* 374 N.W.2d 187, 195 (Minn.App.1985) ("The loss is usually measured as the difference between what the injured party parted with and what he received, together with other damages that were proximately caused by the fraud."). As to the compensability of consequential damages, the Minnesota Supreme Court has adopted the following restatement of the rule:

> "In cases of fraud or deceit, the defendant is responsible for those results which must be presumed to have been within its contemplation at the time of the commission of the fraud, and plaintiff may recover for any injury which is the direct and natural consequence of his acting on the faith of defendant's representations. It must appear that the fraud and damage sustain to each other the relation of cause and effect, or at least that the damage might have resulted directly from the fraud."

*Lewis v. Citizens Agency of Madelia, Inc.,* 306 Minn. 194, 235 N.W.2d 831, 835 (1975)

---

omissions (other than those it cites on appeal) that were not specifically averred in CPI's complaint. The district court denied Quality's motion on the grounds that not every alleged misrepresentation must be included in the pleadings and that Quality had not shown that the evidence it wished to exclude would be more prejudicial than probative. *See id.* 165–67.

7. According to Quality, the only evidence of the value of the property contemporaneous with the

discovery of the alleged fraud was an appraisal by Marc Knoche, who opined that the property's fair market value as of January 8, 1986, was $5 million. *See* Jt.App. at 326. Since the highest level of investment plus contingent out-of-pocket losses claimed by CPI amounted to $4,881,209, Quality argues CPI incurred no damages as of October 1987 when the hotel opened for business. Appellant's Br. at 33–34.

(quoting 8A Dunnell, Minn.Dig. (3d ed.) § 3841). "[T]he out-of-pocket-loss rule has often been described as one capable of very flexible application to individual cases," *Raach v. Haverly,* 269 N.W.2d 877, 881 (Minn.1978), and "must always be construed in the light of the facts of the case then being considered." *Wallace v. Hallowell,* 56 Minn. 501, 58 N.W. 292, 293 (1894). *Accord Tysk v. Griggs,* 253 Minn. 86, 91 N.W.2d 127, 136 (1958). The availability of consequential damages imports into Minnesota's out-of-pocket loss rule an element of the post-transaction damages recognized by the benefit-of-the-bargain rule. The rule crafted by the Minnesota courts thus lies somewhere between a strict application of the out-of-pocket rule and the more liberal benefit-of-the-bargin rule. At the same time, Minnesota courts have consistently emphasized that the point is to compensate actual losses, not prospective gains. Similarly, consequential damages will be constrained by the common law test of proximate cause.

▪ In the case before us, the district court and the parties proceeded below under an erroneous assumption as to the point in time at which out-of-pocket losses are to be calculated. The jury was instructed as follows:

> If you determine that plaintiff is entitled to damages, you are to determine the amount of money which will fairly and adequately compensate the plaintiff for the damage incurred by the plaintiff. Damages for fraud or misrepresentation are limited to the out-of-pocket loss sustained by the plaintiff. That amount is the difference between the actual value of the property and the price paid for it, together with such other damages as were naturally and proximately caused by the fraud *before the discovery of the fraud or misrepresentation.*

Jt.App. at 308 (emphasis added). The underlined portion of the instruction appears to have been in error. Under Minnesota's out-of-pocket loss rule, the date of discovery bears no relevance to the calculation of consequential damages, except as might be relevant to the commencement of a duty to mitigate. Indeed, the date of discovery is equally irrelevant to the assessment of the initial differential in value, which must rather be calculated as of the date of the fraudulent transaction. The jury should have been instructed to calculate CPI's damages as the difference between what CPI paid and what it received as of a date representing the completion of the franchise transaction, along with any consequential damages proximately caused by the fraud. Subject to the restriction of the proximate cause test, consequential damages could conceivably reach well beyond the date of the discovery of the fraud.

▪ Because of the peculiar nature of the value of a franchise, however, we find in the erroneous instruction no basis for reversal of the jury's award in this case. First, the jury was properly instructed that the amount of CPI's out-of-pocket loss was "the difference between the actual value of the property and the price paid for it." *Id.* Though no point in time was specified for the calculation of out-of-pocket losses, that omission does not constitute reversible error on the facts before us. Here we must distinguish between a sale of land—the context in which Minnesota's out-of-pocket loss rule was developed and refined—and a franchise agreement. The core of the distinction lies in the fact that a franchisee such as CPI acquires from the franchisor a set of largely intangible assets, such as a reputation, and a stream of reservation referrals and revenue, that cannot easily be considered "transferred" on the date the franchise agreement is executed. Unlike a fraudulently induced sale of real property, a fraudulently induced hotel franchise deal does not furnish an easily isolated point of transaction. Until the franchised hotel has begun to operate, it is difficult—and arguably impermissibly speculative—for a court to ascertain with any certainty what the plaintiff had actually received from the defendant as of that date, because actual and expected revenues constitute an inseparable component of the value of a hotel franchise. For example, on the date of the signing of the Franchise Agreement between CPI and Quality, no hotel building had yet been erected and no income had yet been generated. Similarly, the value of the hotel franchise on its first day of operation cannot be estimated with accuracy without reference to later prof-

itability. Moreover, the harm from Quality's misrepresentations pertaining to expected occupancy rates did not fully manifest itself until well after the date on which the hotel was opened for business. On the facts before us, the relevant date for calculating out-of-pocket losses arrived shortly after CPI's hotel became fully operational, because only at that time could the court make an accurate assessment of the value of what CPI actually received from Quality. In light of *Raach*'s admonition to apply the out-of-pocket loss rule with "flexibility," 269 N.W.2d at 881, we believe that Minnesota courts would make such an allowance in the context of a franchise. Accordingly, we find no abuse of discretion in the district court's determination to leave somewhat vague the exact point at which out-of-pocket losses must be calculated.

Second, the jury was instructed to add "such other damages as were naturally and proximately caused by the fraud before the discovery of the fraud or misrepresentation." *Id.* As noted above, this portion of the instruction on its face unnecessarily limited the consequential damages available to the plaintiffs. We believe, however, that this error provides no basis for reversal. CPI, the party potentially harmed by the limitation on consequential damages, has brought no challenge to the result in this case. In any event, appellant Quality suffered no harm from that portion of the instruction.

▪ Turning to the claim raised by Quality on appeal, we must determine whether the evidence on damages was both properly admitted and sufficient to sustain the jury's verdict. Quality seeks to reverse the award on the ground that CPI introduced no evidence of the value of the hotel franchise in July, 1987. In that month, Quality alleges, CPI first became aware of the misrepresentations. As we have outlined, the time of the discovery of the fraud is irrelevant to the calculation of the initial out-of-pocket loss. Instead, following on our discussion above, we must determine whether CPI's evidence tended to establish the initial loss as of the October, 1987, point of transaction and whether it was essentially consistent with a proper application of Minnesota's out-of-pocket loss rule.

First, CPI produced evidence showing that its initial capital investment, including land improvements, building, furniture and equipment, totalled $4,302,223.96. *See* Jt.App. at 673. Together with franchise costs of $25,-000, mortgage loan costs of $93,614.25, and miscellaneous startup costs of $82,377.03, CPI's evidence suggested that its initial investment totalled $4,503,238.24. *Id. See also* Trial Tr., Feb. 3, 1994, at 77. Quality countered by arguing that CPI's initial investment was actually $3,941,946, because the total should exclude some $360,000 of tax increment financing contributed by the City of Roseville, as well as the franchise, mortgage loan and startup costs.

The second step under Minnesota's out-of-pocket rule is to subtract the actual value of the property received. To that end, CPI introduced the expert testimony of Kurt Smith, a commercial real estate broker and appraiser. Based on industry standards, comparison with similar properties, and a detailed inspection, Smith testified that the value of the hotel property was $3,110,000 on January 1, 1988; $3,250,000 of July 1, 1988; and $3,420,000 on January 1, 1989. Tr., Jan. 28, 1994, at 34. Because the alleged misrepresentations concerned a business franchise, Smith's appraisal accounted not only for the real estate value of the land and hotel building, but also the value of the ongoing operation.[8] The court admitted in evidence a 52-page report setting forth the basis for Smith's appraisals. Jt.App. at 674–729. We note that a lack of actual revenue data along with the lack of a real estate tax assessment accounting for the newly constructed hotel would have made it difficult if not impossible for CPI to produce evidence of the value of its franchise prior to January 1, 1988.

The third step is to add any consequential damages proximately caused by the misrepresentation. To that end, CPI introduced evidence of losses totalling $246,056.

---

**8.** Smith testified that as of January 2, 1988, the property's real estate tax was based on an assessed market value of $2,534,000. Tr., Jan. 28, 1994, at 50. On January 2, 1987, prior to the completion of the hotel building, the property was assessed at $440,000.

**650**

The total initial and consequential out-of-pocket losses claimed by CPI amounted to $1,499,294.24. The jury returned a verdict in the amount of $796,056.00. Jt.App. at 315. Based on our careful review of the record, we conclude that the jury's award represented a permissible approximation of the difference between what CPI paid and what it received as of October, 1987.[9] Because neither party has raised any objection to the district court's treatment of consequential damages, we decline to undertake an independent investigation of that evidence and instead limit our analysis to the question of CPI's initial out-of-pocket loss. It is sufficient for the purposes of this claim to observe that the jury returned a verdict closely approximating what the evidence showed to be CPI's initial out-of-pocket loss.

 As to Quality's claim that only contemporaneous evidence may be admitted to establish the value of a hotel franchise, we disagree. The post–1987 evidence was certainly within the judge's discretion to admit, because it was probative of the value of the hotel franchise at the relevant point of transaction following the opening of the hotel in October, 1987. Because the evidence presented to the jury was essentially consistent with a proper application of Minnesota's out-of-pocket loss rule, we find that the evidence was sufficient to sustain the jury's verdict.

For the foregoing reasons, the judgment of the district court is affirmed.

MORRIS SHEPPARD ARNOLD, Circuit Judge, concurring in the judgment.

I agree with all of the court's opinion except that part of it that defines CPI's operating losses as consequential losses. They are not. They are evidence of the difference between the value of the capital asset that produced them and the price paid for it. In other words, a capitalization of the lost income stream produces the value of the loss of capital. Adding them in is therefore double counting.

I nevertheless concur because I think that the award is a close approximation of the difference between CPI's initial investment (roughly $4,000,000) and the actual value of the franchise (roughly $3,250,000). I agree with the court that this verdict is well within the range of permissible verdicts and therefore concur in affirming the judgment.

---

9. As Quality's counsel conceded, CPI's initial investment was worth at least $3,941,946. Subtracting from that figure Smith estimates that the January, 1988, value of the franchise property was $3,110,000, we reach a sum ($831,946) quite close to the amount of the jury's verdict.