# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2480

_____

Northstar Industries, Inc., a
Minnesota corporation,

      Plaintiff-Appellant,

v.

Merrill Lynch & Co., Inc. and Merrill
Lynch Global Private Equity, Inc.,
f/k/a Merrill Lynch Global Partners,
Inc., foreign corporations, and Robert
F. End, individual,

      Defendants-Appellees.

Appeal from the United States
District Court for the District of
Minnesota.

_____

Submitted: March 11, 2009
Filed:  August 17, 2009

_____

Before WOLLMAN, BRIGHT and COLLOTON, Circuit Judges.

_____

BRIGHT, Circuit Judge.

Northstar Industries, Inc. ("Northstar") brought this action in the district court against Merrill Lynch & Co., Inc., Merrill Lynch Global Private Equity, Inc. ("MLGPE"),[1] and Robert F. End for the balance of a brokerage fee it claimed due in

_____

[1]Unless otherwise specified, we refer to Merrill Lynch & Co., Inc. and Merrill Lynch Global Private Equity, Inc. collectively as Merrill Lynch.

the sum of $5.6 million. Northstar contended that fraudulent representations by Merrill Lynch caused Northstar to accept a lower fee than the amount to which it was entitled. On appeal, Northstar challenges the district court's order granting Merrill Lynch's 12(b)(6) motion to dismiss, arguing that the district court erroneously 1) dismissed the action based on factual findings directly contrary to the complaint, 2) failed to address Northstar's prayer for rescission, and 3) concluded that Minnesota fraud law could not compensate Northstar's damages. Having jurisdiction pursuant to 28 U.S.C. § 1291, we reverse and remand to the district court for further proceedings.

## I. Background[2]

For almost forty years, Northstar has provided services related to mergers and acquisitions. Its president, Thomas O'Connell, has closed well over 350 transactions during his career. For over twenty-five of these years, Northstar has maintained an ongoing business and personal relationship with Mr. Orville "Gene" Bicknell, former owner of NPC International, Inc., the world's largest franchisee of Pizza Hut restaurants.

In January 2004, Northstar entered into a fee agreement with Stonington Partners, Inc., a company engaged in acquiring and investing in businesses ("Stonington Fee Agreement"). Stonington agreed that, if Northstar introduced Stonington to a business that it ultimately bought, Northstar would receive a finder's fee in the amount of 2% of the first $100 million in transaction value and 1% of the value thereafter.

In late 2004 or early 2005, arising from this long-standing relationship between Northstar and Bicknell, Northstar learned that Bicknell was considering selling one

---

[2]The facts in Northstar's Amended Complaint must be taken as true for purposes of this appeal.

-2-

of his companies, NPC. Northstar brought this information to Stonington. Stonington then referred Northstar to MLGPE as a potential NPC purchaser.

On March 4, 2005, Northstar and Merrill Lynch adopted the terms of the Stonington Fee Agreement ("March Fee Agreement"). Robert F. End, Managing Director of Merrill Lynch, then began negotiating with Bicknell and NPC for the possible purchase of NPC as directed by Merrill Lynch. Northstar did not participate in these negotiations. Around May 12, 2005, End and his Merrill Lynch colleague, Christopher J. Birosak, contacted Northstar by telephone and ordered Northstar to cease any further contact with Bicknell or NPC. Northstar did so and Merrill Lynch became Northstar's only source of information about the deal.

In October 2005, after seven months of negotiations, End contacted Northstar and spoke to its Senior Vice President B. Wayne Quist. End stated that Bicknell's purchase price was $615 million, and that this purchase price would result in a fee of $7.15 million due and payable to Northstar under the March Fee Agreement. However, in order to close the deal at $615 million, End stated that the fees associated with the transaction needed to be significantly reduced. End proposed to Quist that Northstar accept a "proportionate" fee reduction in relation to the other parties entitled to a fee in the transaction, all sacrificing "equally." End stated that a "proportionate" or "pro rata" reduction would result in a fee of $1.5 million for Northstar (a 78% reduction that amounted to approximately $5.6 million). End told Quist that he needed an answer from Northstar no later than the start of the business day on Monday, October 17, 2005. Quist stated that he did not have the authority to approve such a fee reduction and would need to speak to O'Connell about End's proposal.

After discussing the matter with O'Connell, Quist sent an e-mail message to End proposing that Northstar reduce its fee by approximately 50% to $3.6 million cash at closing, plus other considerations, based on "what you said [yesterday] . . . that you are willing to take pro rata cuts from the total fees and expenses." Complaint ¶37. Minutes after receiving Quist's e-mail, End replied electronically to Quist, stating that

-3-

Northstar's proposal would not work, and that, "The deal is dead and I will communicate this to [Bicknell] on Monday morning." Complaint ¶38.

That Sunday, O'Connell called End. End reiterated that the $15 million shortfall in the transaction had to be compensated from the fees in the transaction, which could only work if everyone entitled a fee took a "proportionate" or "pro rata" fee reduction. Furthermore, End stated that Northstar would receive a cash fee of $1.5 million following such a "pro rata" reduction. End also assured O'Connell that "everyone due a fee would take a 'pro rata' reduction, that 'all parties would be treated on the same basis,' that there would be an accounting of all fee reductions, [and] that the total fees in the transaction would be reduced by at least $15 million in order to meet Bicknell's price of $615 million." Complaint ¶39.

Based on End's representations, Northstar agreed to enter into a new fee agreement ("November Fee Agreement") so as to reduce its fee to $1.5 million. "Had Northstar known the truth, Northstar would not have agreed to reduce its fee to $1.5 million and the transaction could have been closed without such a fee reduction to Northstar." Complaint ¶ 42.

On or about October 20, 2005, four days after End's representations concerning pro rata fee reductions for all parties, Merrill Lynch and Bicknell/NPC entered into a mutual exclusivity agreement for the sale of NPC to Merrill Lynch for $615 million. The purchase closed on May 3, 2006 and Northstar received its full $1.5 million fee.

In March 2007, Northstar saw NPC's press release, as well as its 10K and S-8 forms, which companies publicly file with the Securities and Exchange Commission. Northstar realized that the total fees paid at the closing of the transaction had not decreased from the May 9, 2005 proposed amount of $23.5 million, but in fact had increased to $24,270,000 at the time of closing. Thus, Northstar repeatedly requested that Merrill Lynch explain the increase in total fees paid in the transaction and provide an accounting of fees as promised by End.

In response, on May 9, 2007, End called O'Connell and told him for the first time that the reduction in fees was in fact not "proportionate" or "pro rata." End admitted that he told Quist and O'Connell that the fee reductions would be "proportionate" and "pro rata," but stated to O'Connell that he regretted using the term "pro rata" because the fee reductions were not in fact so. End further stated that he should have used a term other than "pro rata." End also stated, for the first time, that End's group, MLGPE, received a fee of $3,000,000, a 50% reduction from its usual fee, and that Stonington requested $1.5 million, but received $500,000 in payment.

O'Connell told End that this was not what End had represented in their telephone discussion on October 16, 2005, and reiterated his request for an accounting of all fees paid in the transaction. End again stated that, although he told O'Connell in about October 2005 that the fee reductions were "pro rata," this was not what he meant. End agreed to provide Northstar an accounting of fees, stating that Cassey P. Davis of his office would provide such information via e-mail. Quist e-mailed Davis requesting such information.

Not having received a response from Davis, Quist e-mailed End on around May 29, 2007, requesting that Northstar "be treated like the others [in the deal] and that Northstar's fee be increased based on End's representations and promises to Northstar that all the fees in the transaction were to have been reduced on a 'proportionate,' 'pro rata' basis, that everyone due a fee would sacrifice 'equally,' and that there would be an accounting of fees." Complaint ¶51. End responded by e-mail the next day, and, for the first time, claimed that when discussing fee reductions, he was only referring to three fees—Northstar's, Stonington's, and MLGPE's, but not the Merrill Lynch $14,047,000 debt placement fees/costs, attorneys' fees, accountants' fees, or any other fees. End further informed Northstar for the first time that the MLGPE fee had not been finalized until the closing and a fee agreement with Stonington did not exist until the "eleventh hour." End then refused to provide Northstar with the promised full accounting of fees.

O'Connell and Quist spoke with End by telephone on or about June 1, 2007, when End revealed that Northstar's fee reduction constituted the only agreed reduction in October 2005. End indicated that he regretted the Northstar fee reduction and stated that he would consider creative solutions to the fee dispute in an effort to supplement the Northstar fee, requesting that Northstar forward such a proposal to Merrill Lynch.

On or about June 15, 2007, Northstar sent a letter to Merrill Lynch outlining the terms of a proposed settlement that would increase the Northstar fee, plus other considerations, in part by making the Northstar fee reduction identical to the 50% reduction received by End's organization, MLGPE. End then sent a letter to Northstar refusing to settle the matter, or discuss it further, and for the first time denied stating that any fee reductions with the NPC transaction would be "pro rata."

Northstar then brought the present action in the district court, alleging that Merrill Lynch and End engaged in fraud and misrepresentation, breached their duty of good faith and fair dealing, and breached certain fiduciary duties. Merrill Lynch immediately moved to dismiss, arguing that Northstar's fraud claim failed because Northstar could not establish justifiable reliance or damages based on the alleged fraud. In response, Northstar filed an Amended Complaint that additionally alleged the falsity of End's e-mail to Quist stating that "the deal is dead."

Merrill Lynch moved to dismiss a second time, and the district court granted the motion. The district court held that no fiduciary relationship existed between Northstar and Merrill Lynch and, therefore, Northstar's claim for breach of fiduciary duty failed as a matter of law. The district court also dismissed Northstar's claim for breach of good faith and fair dealing because Northstar did not allege that Merrill Lynch breached the fee agreement. Finally, the district court held that Northstar's claim for fraud failed because Northstar could not establish the damages element of fraud. Northstar timely appealed to this court, asserting a claim of rescission, which the district court had not addressed, and claiming that the district court erred in ruling

that under Minnesota law no damages could be awarded because the brokerage fee was a contingent one.

## II. Discussion

This court reviews de novo the district court's grant of a motion to dismiss an action for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Hafley v. Lohman*, 90 F.3d 264, 266 (8th Cir. 1996). Dismissal is proper when the plaintiff's complaint fails to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, the factual allegations in a complaint, assumed true, must suffice "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The complaint is construed most favorably to the nonmoving party. *Casino Res. Corp. v. Harrah's Entm't, Inc.*, 243 F.3d 435, 437 (8th Cir. 2001).

To establish fraudulent representation under Minnesota law, a plaintiff must show that:

> (1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffer[ed] pecuniary damage as a result of the reliance.

*Hoyt Props., Inc. v. Prod. Res. Group, L.L.C.*, 736 N.W.2d 313, 318 (Minn. 2007) (citing *Specialized Tours, Inc. v. Hagen*, 392 N.W.2d 520, 532 (Minn. 1986)).

The district court rejected, as a matter of law, Northstar's claim for fraudulent representation on the grounds that Northstar failed to establish the damages element.[3] According to the district court, without showing that the deal would have been consummated in the absence of the fee reduction, Northstar could not show damages. Specifically, the district court noted,

> Northstar's calculations, however, fail to account for the contingent nature of each fee agreement. Northstar could receive no finder's fee if MLGPE and NPC did not complete a deal, a reality Northstar accepted by agreeing to reduce its fee in order to facilitate the ultimate sale. In this context, Northstar's alleged damages cannot be actual losses. Rather, Northstar seeks hypothetical prospective gains that are not cognizable damages in this case. Accordingly, Northstar's fraud claim fails as a matter of law.

*Northstar*, 558 F. Supp. 2d at 950.

_____

[3] Nonetheless, the district court recognized that the pleadings properly asserted representations on which Northstar could rely:

> Here, the November agreement states that MLGPE will "in no case" pay Northstar more than $1.5 million. While it would preclude reliance on a statement promising further compensation after the deal, such contract language does not contradict End's alleged promises about pro rata reductions and the potential death of the deal. Indeed, the November agreement contains no reference to pro rata reductions or deal saving actions, and without explicit mention of these matters, there can be no complete contradiction. Moreover, although the integration clause prevented the alleged pro rata promise from becoming part of the agreement, it does not foreclose the possibility that the promise induced Northstar to enter into the deal. For these reasons, defendants [Merrill Lynch] have not demonstrated that as a matter of law Northstar could not rely on End's purported statements.

*Northstar Indus., Inc. v. Merrill Lynch & Co., Inc.*, 558 F. Supp. 2d 944, 949 (D. Minn. 2008) (internal citation omitted).

The district court's rule would produce the result that a party could defraud others in negotiations for contingent contracts without liability or consequence, when Minnesota law holds otherwise. Generally in fraud and misrepresentation cases, Minnesota uses the "out-of-pocket" approach to calculate damages, which amounts to "the difference between what is given and what is received." *Jensen v. Peterson*, 264 N.W.2d 139, 142 (Minn. 1978). Under Minnesota law, however, "[w]here the out-of-pocket rule does not apply, the plaintiff may recover for any injury which is the direct and natural consequence of having acted on the faith of defendant's representations." *Hanks v. Hubbard Broadcasting, Inc.*, 493 N.W.2d 302, 310 (Minn. Ct. App. 1992). Other jurisdictions use the benefit-of-the-bargain approach to calculating damages, which amounts to the "difference between the actual value of the property and what its value would have been if it had been as represented." *Heberer v. Shell Oil Co.*, 744 S.W.2d 441, 443 (Mo. 1988) (en banc). The district court here additionally observes that "[t]he rule 'crafted by the Minnesota courts thus lies somewhere between a strict application of the out-of-pocket rule and the more liberal benefit-of-the-bargain rule.'" *Northstar*, 558 F. Supp. 2d at 950 (quoting *Commercial Prop. Invs., Inc. v. Quality Inns Int'l, Inc.*, 61 F.3d 639, 648 (8th Cir. 1995)).

Furthermore, the district court notes that "Minnesota courts have consistently emphasized that the point is to compensate actual losses, not prospective gains." *Northstar*, 558 F. Supp. 2d at 950 (quoting *Commercial Prop. Invs., Inc.*, 61 F.3d at 648). However, another measure of damages for fraud provided by Minnesota courts focuses on a defendant's profits, instead of a plaintiff's losses. This measure awards damages based on a disgorgement of the benefits a defrauder received by virtue of the fraud. For example, the Minnesota Court of Appeals in *Estate of Jones by Blume v. Kvamme*, 430 N.W.2d 188, 196 (Minn. Ct. App. 1988), *aff'd in relevant part and rev'd in part on other grounds*, 449 N.W.2d 428 (Minn. 1989) relied on *Nelson v. Serwold*, 576 F.2d 1332, 1338 (9th Cir. 1978), which awarded to the defrauded party the benefit that the defrauder received from the fraud in a stock sale. *Nelson* commented:

The early cases generally awarded the difference between the value given and the value received, but the recent trend looks to defendant's profits, rather than to plaintiff's losses, in measuring damages. . . . This rule provides full compensation for injury caused by fraudulent conduct, and, significantly, it removes all incentive to engage in such conduct.

576 F.2d at 1338.

Minnesota law therefore will allow for damages in certain fraud and misrepresentation cases. In a case of contingent liability such as this one, the benefit received by the defrauding party could be the measure of damages.[4] *See id.* We therefore conclude that Northstar's claim does not, at the 12(b)(6) stage, fail as a matter of law on the basis of no recoverable damages and, in fact, survives Merrill Lynch's motion to dismiss.

Surviving a motion to dismiss, of course, differs from surviving summary judgment or proving damages at trial. "A grant of summary judgment is proper when there 'is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" *Emergency Med. Servs., Inc. v. St. Paul Mercury Ins. Co.*, 495 F.3d 999, 1004-05 (8th Cir. 2007) (quoting *Conolly v. Clark*, 457 F.3d 872, 874 (8th Cir. 2006)). It may well be that Northstar cannot offer facts supporting its proposition that the deal would have survived without the fee reduction.

Thus, if it appears after discovery that the sale to Merrill Lynch would not have been consummated without Northstar's fee reduction, Merrill Lynch's alleged fraud may become irrelevant. Without a consummated sale, Northstar would have obtained

---

[4]We express no opinion on precisely what measure of damages might remedy Northstar's alleged loss in this case. We have focused, as have some Minnesota courts, on Merrill Lynch's increased profit, but other measures of damages, including the reasonable value of Northstar's services, could be appropriate. This possible issue is for the district court on remand.

no fee.  However, at the 12(b)(6) stage, we determine only that the pleadings suffice to withstand Merrill Lynch's motion to dismiss on the issue of damages.

### III.  Conclusion

For the foregoing reasons, we reverse and remand to the district court for further proceedings in accordance with this opinion.[5]

_____

---

[5]We do not reach Northstar's claim for rescission of its reduced fee agreement and reinstatement of its original brokerage fee.  The issue of damages, if any, and on what basis remains with the district court.  Additionally, Northstar moves to strike an argument Merrill Lynch raises for the first time on appeal.  We agree that the argument was not raised in the district court and decline to consider it.  *See Shanklin v. Fitzgerald*, 397 F.3d 596, 601 (8th Cir. 2005) ("Absent exceptional circumstances, we cannot consider issues not raised in the district court.").  Thus, Northstar's motion is moot.